(96 South. 787)

No. 25656.

## UNION SULPHUR CO. v. PARISH OF CALCASIEU et al.

(April 2, 1923. Rehearing Denied April 30, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Counties ⊜47—Parishes; "police jury" has only such powers as are positively delegated to it.**

The name "police jury" implies a body or jury for exercise of limited portion of governmental or police power, which, under uniform jurisprudence, exists to extent only that it is delegated by positive legislation.

2. **Statutes ⊜215—To be construed in light of existing conditions.**

Laws like contracts are to be construed in the light of conditions as they exist at the time of their passage.

3. **Canals ⊜15—Exemption of city from taxation by parish held inapplicable to special tax for navigation canal.**

In view of Const. 1921, art. 10, §§ 5, 10, and art. 14, §§ 7, 8, 11, 12, 14, and in view of development of such constitutional provisions, provision of Lake Charles charter depriving police jury of jurisdiction to impose taxes does not apply to tax imposed by vote of taxpayers for construction and operation of navigation canal under Act No. 68 of 1921.

4. **Canals ⊜15—Tax for navigation canal held for public purpose and valid, notwithstanding federal government's ownership of right of way and control over river to be improved.**

In view of Const. 1921, art. 14, § 6, relative to navigation canals, and section 14 relative to levy of taxes and issue of bonds, tax levied under Act No. 68 of 1921 for navigation canal is for a public purpose and does not violate Const. 1921, art. 4, § 12, providing that political corporations shall not loan funds or credit, though right of way is owned by federal government, and such government has jurisdiction in admiralty and for war purposes over river to be improved as part of the water course.

5. **Constitutional law ⊜20—Wide latitude allowed Legislature in construing Constitution.**

Wide latitude is due Legislature in interpretation of the Constitution, and court is not justified in disturbing its action, unless there is clear violation of some restrictive provision, especially where Legislature is authorized to carry provisions into effect.

6. **Evidence ⊜5(2)—Judicial cognizance taken of character and importance of projected improvement.**

The court takes judicial cognizance of the character and importance of the project known as the Intercostal Canal, extending through the states bordering on the Gulf of Mexico.

O'Niell, C. J., dissenting.

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Jerry Cline, Judge.

Suit by the Union Sulphur Company against the Parish of Calcasieu and others. From a

judgment for plaintiff, defendants appeal. Reversed, and plaintiff's demands rejected.

A. V. Coco, Atty. Gen., Paul A. Sompayrac, Asst. Atty. Gen., Griffin T. Hawkins, Jr., Dist. Atty., of Lake Charles, Mark C. Pickrel, Asst. Dist. Atty., of Oakdale (E. R. Kaufman, R. R. Stone, and McCoy & Moss, all of Lake Charles, of counsel), for appellants.

Cullen R. Liskow, of Lake Charles, for appellee.

DAWKINS, J. The issues presented by this case are as follows:

(1) Does the exemption from parish taxation contained in the legislative charter of the city of Lake Charles prevent the subjection of property situated therein to the species of special taxation contemplated by Act No. 68 of 1921, empowering parishes to build and operate navigation canals when authorized by a majority in number and amount of the property taxpayers of the parish?

(2) Since the title to the rights of way for the canal in this case is in the federal government, and its jurisdiction in admiralty and for war purposes extends to the Calcasieu river which is to form a part of the water course to be constructed and improved, are the funds to be raised by the tax intended for a public purpose; and will the expenditure thereof in conjunction with or through the government for said purpose violate section 12 of article 4, of the state Constitution?

The lower court answered the first question in the affirmative, but the second in the negative, enjoined the proceedings for levying the tax, and the defendant, police jury, has appealed.

### Opinion.

The pertinent facts are not disputed. There was a majority in number and amount of the property taxpayers outside the city in which category is the property of the plaintiff voting against the tax.

The city's charter was granted by the Legislature in 1867, and the exemption in question reads as follows:

"And provided further, that the police jury of the parish of Calcasieu shall no longer have any jurisdiction within the limits of said town or impose any taxes on persons or property therein, except such jurisdiction as may be necessary to impose such special tax as may be required to make or repair the courthouse or jail in said parish, for which purpose taxes may be levied on the property within said town or corporation by said police jury equal and no more than on property in other portions of the parish."

In order to determine whether or not the exemption is effective against the proposed tax and bond issue, it becomes necessary that we review the constitutional and statutory provisions and their development, governing police juries, as well as the class of taxation involved in this case.

The earliest enactment for the organization of police juries which we have been able to find, was Act March 25, 1813, p. 154. It provided for the creation of police jury wards by the parish judge and justices of the peace, and the election of the jurors by the "inhabitants." Both the judge and justices of the peace were ex-officio members of the "assembly" designated to handle the affairs of the parish; but, when dealing with the subject of taxation, at least two-thirds of the police jurors were required to participate. Its powers were defined under eleven specifically enumerated heads, to which very little of general authority has been added to this day.

[1] The very name "police jury" implies a body or jury for the exercise of a limited portion of the governmental or police power, which, under uniform jurisprudence, exists to the extent only that it is delegated by positive legislation. Sterling v. Parish of West Feliciana, 26 La. Ann. 59; Bertrand v. Parish of Vermilion, 28 La. Ann. 588; State v. Dan Miller, 41 La. Ann. 53, 5 South. 258, 7 South. 672; State v. Harper, 42 La. Ann.

312, 7 South. 446; Police Jury, Lincoln Parish, v. Harper, 42 La. Ann. 776, 7 South. 716; Concordia Parish v. Natchez, etc., R. Co., 44 La. Ann. 613, 10 South. 809. It, or the parish which it represents, stands much lower in the scale of governmental agencies than a municipality, strictly speaking, and is often termed a quasi corporation. The chief distinction between such public bodies and municipalities, is that they are clothed with such governmental powers as they possess primarily and directly by the Legislature and without consent of the citizens or inhabitants immediately affected; while the charters of municipal corporations are granted at the instance of the people who compose them. The former are mere auxiliaries of the state. McQuillin on Mun. Corps. vol. 1, p. 269 et seq. §§ 111 and 112, and authorities cited. So that, when, in the charter of the city of Lake Charles, it was said that the "police jury * * * shall no longer have any jurisdiction within the limits of the said town, or impose any tax upon persons or property, * * *" the Legislature had in mind those matters of limited jurisdiction and purposes for which taxes might be levied comprehended within the scope of usual and ordinary affairs of the parish with which police juries, as such, were permitted to deal, and which it had directly conferred upon them.

Taxation by parishes or police juries had not been mentioned in the Constitution when the charter of Lake Charles was granted in 1867. They had by legislative enactment (Act March 23, 1813) power: "To levy such taxes as they may judge necessary to defray the expenses of their respective parishes." They were required to be levied upon the same species of property as those for state purposes; and in the "river parishes" a "special tax upon land for the construction and support of levies" was authorized (Act No. 106, p. 82, of 1847). They were also permitted to levy a per capita road tax not exceeding $15 per year (Acts 1867, p. 355; R. S. of 1870, § 2751).

[2] These powers of taxation were, as above stated, conferred directly upon the police jury, and it was, undoubtedly, the purpose of the Legislature, in withdrawing the city of Lake Charles from the jurisdiction of the police jury of Calcasieu parish, to relieve the persons and property in said city from such taxes. But laws, like contracts, are to be construed in the light of conditions as they exist at the time of their passage. It is inconceivable that a lawmaking body should intend, by the use of general terms in an exemption, to paralyze its power in a field of legislation which it had not yet entered, and, in the exercise of which the Constitution prescribed a particular mode; or that it should be required to deal with that exemption in such new field by specific enactment. On the contrary, it must be made to appear clearly and affirmatively that the exemption relied upon reaches the class of taxation against which relief is claimed.

The Legislature had, prior to the Constitution of 1864 (which was in effect when the charter of Lake Charles was granted) by Act February 26, 1855, p. 12, authorized a proceeding permitting the property taxpayers of parishes and municipalities to become stockholders in corporations "undertaking works of public improvement." Negotiable certificates were to be issued in the name of each taxpayer for the amount of his annual taxes as private property over which the public authorities had no control. But this was in no sense a tax imposed by the parish or police jury; it was merely a scheme for taking the sense of the property taxpayers upon the wisdom of making internal improvements in the manner indicated, by a corporate entity distinct from the parish or its governmental body, and was dependent upon the will of the taxpayer expressed in popular election.

Then the Constitution of 1864 by article

137, which appears under the heading "Title X, Internal Improvements," provided a method for making internal improvements, which was somewhat of an innovation in this state, as follows:

"The General Assembly may create internal improvement districts, composed of one or more parishes, and may grant a right to the citizens thereof to *tax themselves* [italics ours] for their improvements. Said internal improvement districts, when created, shall have the right to select commissioners shall have the power to appoint officers, fix their pay, and regulate all matters relative to the improvements of their districts, provided such improvements will not conflict with the general laws of the state."

This method of internal improvement had no connection with parish government or taxation, as such, and for the first time (except in Act February 26, 1855) introduced the principle of self-taxation by vote of the property owner. Districts so created were made self-governing bodies, and exemptions from parish taxation in municipal charters located therein, such as the one in this case, certainly could have had no effect against the imposition of taxes by the commission. This is true, not so much because of the machinery for the administration, but mainly because of the nature of the tax and the source of the authority for its imposition, the taxpayer. It was the retention or reservation of the power in the people composing such districts, through constitutional limitation, to themselves determine the wisdom of such taxation, and to fix its extent, rate, etc.

Therefore, when the Constitution and the Legislature later placed in the hands of police juries the administrative duties incident to the submission of such propositions and the collection of these taxes, that action did not have the effect of changing the nature of the tax, or of converting it into parish taxation within the purview of the provisions of municipal charters, such as the one under consideration.

Legislation for internal improvement found early expression in the acts of Congress donating parts of the public domain to school districts, the states, railroads, etc.; and the state, in turn, took similar steps toward its subdivisions and institutions. Matters such as these were not a part of the ordinary objects of government; the primary purpose was to promote the development of the country. The basic reason for organized society is the protection of the person and property of the citizen, and for its support taxation is necessary. In a country so complex as our own, this power must be distributed among many agencies. It is reasonable to assume, therefore, that the Legislature, in distributing it between parish and municipal governments, intends to accomplish this fundamental purpose, unless and to the extent that by express provision or fair implication a wider scope is given. But we imagine that no one would contend that special taxation, which, under constitutional restriction, depends for its exercise upon the will of the taxpayer, is an incident to either municipal or parochial government; or that either the granting to or withholding it from them can rest upon doubtful ground.

On the other hand, taxation of this kind, which was mentioned first in the Constitution of 1864 (article 137) contemplates a more direct and tangible benefit to the citizen than does a tax purely for the support of the government, state or local. The very term "internal improvement" implies an enhancement of community and individual welfare. Not that every individual or piece of property within the taxing district shall be directly benefited, but that the entity authorized to act by the composite voice of its taxpayers will receive an equivalent value for its expenditure. Constitutional provisions such as this, when self-operating or when carried into effect by legislation where such is necessary, are but a recognition and putting into exercisable form a part of the power, which, under our theory of government, rests pri-

marily in the people themselves. The grant or reservation is made to and in favor of the units so designated as a geographical whole, and without regard to the existence within them of smaller subdivisions which may possess powers of their own obtained from either similar or different sources.

The Constitution of 1868 did not mention the subject of special taxation of this nature; but that of 1879, under the general head of "Revenue and Taxation," not only dealt with state and local taxation, but placed a maximum limit on each, except that which was to be imposed by vote of the taxpayer. Article 202 declared:

"The taxing power may be exercised by the General Assembly for state purposes, and by parishes and municipal corporations, under authority granted to them by the General Assembly, for parish and municipal purposes."

By the power here referred to was clearly meant those ordinary purposes of taxation which the Legislature itself could bestow. It certainly did not include taxation, the power to impose which had been by the same Constitution expressly placed in other hands, i. e., the taxpayer.

Article 204 limited the purposes for which state taxes might be imposed to the support of the state government, its institutions, the payment of principal and interest of the public debt, the supplying of Confederate veterans with artificial limbs, and levee purposes. Article 209 also limited the rate of state taxation to 6 mills, and that of parishes and municipalities to 10 mills; but to this limitation, in so far as the two latter were concerned, was added a proviso that it should not prevent the taxpayers by popular vote from imposing upon themselves additional taxes for public improvements.

Here was a clear recognition of the distinction between the ordinary affairs of the parish, for which taxes were to be levied, and those for improvements and expenditures which had to depend upon the author-

153 LA.—28

ity of the taxpayer. As to the latter, in placing no limit thereon, it was doubtless assumed at that time that the self-interest of the taxpayer would be sufficient safeguard against excessive taxation. Instead of a district to be created by the Legislature of one or more parishes and a commission for its government, as under the Constitution of 1864, parishes and municipalities were designated as the agencies for submitting to the property taxpayers propositions to "tax themselves," and money raised in this way could be used for the purposes alone for which it had been voted.

The same idea and distinction was carried into but considerably enlarged in the Constitution of 1898. There was article 232, similar to 209 of 1879, and article 270, permitting the taxpayers by majority vote to impose taxes "in aid of public improvements or railway enterprises" not to exceed five mills. While in article 281 elaborate machinery was provided for enabling parishes, municipal corporations, and drainage districts (to which by subsequent amendments numerous other subdivisions were added) to capitalize this species of taxation, into bonds maturing over a period of not more than 40 years. Among the subdivisions under article 232, as well as 281, as subsequently amended, were wards, school districts, drainage districts, road districts, etc. It would require considerable "stretching" of an exemption such as the one in this case to say that it would have prevented the including of the municipality in one of these districts. Yet, if we accept the contention of plaintiff, the mere enlargement of the territory, so as to include the entire parish, although the object and purpose might be the same as in the lesser districts, would have the effect of eliminating the municipality from its operation. We do not believe such was the intention of the lawmaker.

In the present Constitution of 1921, the subject of general taxation was dealt with

in article 10, also under the general head of "Revenue and Taxation," as was done in those of 1879 and 1898. Section 5 of that article provides:

"Parochial and municipal corporations and public boards may exercise the power of taxation, subject to such limitations as may be elsewhere provided in this Constitution, under authority granted to them by the Legislature for parish, municipal and local purposes, strictly public in their nature. The provisions of this section shall not apply to, nor affect, similar grants to such political subdivions under other sections of this Constitution which are self-operative."

And section 10 of the same article reads:

"For the purpose of constructing or improving public buildings, school houses, roads, bridges, levees, sewerage or drainage works, or other works of permanent public improvement, title to which shall be in the public or for the maintenance thereof, any political subdivision may levy taxes, in excess. of the limitations otherwise fixed in this Constitution, not to exceed in any year five mills on the dollar for any one of said purposes, and not to exceed in any year twenty-five mills on the dollar, on any property, for all of said purposes; and for giving additional support to public schools, any parish, school. district or sub-school district, or any municipality, which supports, or contributes to the support of, its public schools, may levy taxes, in excess of the limitations otherwise fixed in this Constitution, not to exceed, in the aggregate, on any property, in any year eight mills on the dollar; provided, no special tax authorized by this section shall run for a longer period than ten years, and, provided further, that the rate, purpose and duration of any such special tax shall have been submitted to the resident property taxpayers qualified to vote in the subdivision in which the tax is to be levied, and a majority of those voting, in number and amount, shall have voted in favor thereof. * * *"

This latter section provides a self-operating method of special taxation, depending also upon the vote of the taxpayer, exclusively upon a millage basis of limited extent, and which cannot be funded into bonds, or run beyond the period of ten years. The amount of money arising therefrom annually must, therefore, necessarily vary with the assessment. But the purposes for which it can be collected and spent must be designated in the authority granted by the taxpayer, and cannot be diverted to any other end, such as the ordinary expenses of local government.

For the further treatment of the subject of local taxation, parochial, municipal, etc., referred to in section 5 above quoted, we must turn to the article 14 or subdivision of the Constitution dealing with "parochial and municipal affairs." There we find that the Legislature is given power to establish or organize "new" parishes, within certain limits, and to provide therefor optional plans of government. Section 7 declares that nothing in the present Constitution (the city of Monroe excepted) shall affect the partial or total withdrawal by their charters of cities and towns "from the taxing jurisdiction of the parochial authorities"; and section 8 provides that not more than half of the general parochial tax shall be levied within municipalities having a population in excess of 1,000 inhabitants which provide and maintain systems of street paving of their own.

Of course, section 7 neither added to nor took anything from the exemptions contained in municipal charters at the time of its adoption; while the limitation in section 8 expressly applies to taxation for general parochial purposes. But following as it does immediately upon the saving provisions of section 7, it would appear to be a constitutional interpretation and extension of the same kind of privileges to all other municipal corporations having a population in excess of 1,000 inhabitants which enjoy none or less than that provided by it.

Section 11 of the same article provides:

"No parish tax, the parish of Orleans excepted, for all purposes whatsoever, shall exceed in any one year four mills on the dollar of assessed valuation. This limitation shall not apply to nor include any other tax levy elsewhere provided in this Constitution. * * *"

And section 12 further provides:

"Except as otherwise provided in this Constitution, no municipal tax, for all purposes whatsoever, shall exceed, in any one year, seven mills on the dollar of assessed valuation; provided, that where any municipality is, by its charter or by law exempt from payment of parish taxes or, under legislative authority, maintains its own public schools, it may levy an annual tax not to exceed ten mills on the dollar of assessed valuation."

Here again it is seen that, although municipalities are limited for general purposes of government to seven mills on the dollar, where any of them "by its charter or by law" is "exempt from payment of parish taxes, or under legislative authority maintains its own public schools, it may levy an annual tax not to exceed ten mills * * *" the difference between the two classes of municipal corporations being just one mill less than the general parish tax, showing that the object was to. protect the taxpayer against duplication of taxation for general governmental purposes. It would be little consolation to the property owner within those municipalities which do not enjoy such exemption to know that the municipal tax was limited to seven instead of ten mills, if he was to be subjected to all kinds of special taxation which parishes or other subdivisions might levy under the provisions hereinabove quoted and discussed, which the exempt class would escape.

Section 14 of article 14 of the present Constitution, in the course of some twelve subsections, consuming five full pages, takes up and deals elaborately with the subject of special taxation, and which can be utilized only through the issuance of bonds. The subdivisions are named, as well as the maximum rates, the limitations upon the amount and maturity of the bonds, the purposes for which they may be issued, and a prescriptive period within which attack thereon may be made is fixed. In every instance, except subsection (e), authority to act must be derived from the taxpayer. In that single case, police juries and municipalities are permitted, after making provision for all statutory and necessary charges, to fund into bonds for a period of not more than ten years, the residue of the general alimony tax which they are authorized to levy under the said Constitution.

This court has already had occasion, in analogous cases, to point out the distinction between taxation for ordinary governmental purposes and the kind involved here. In the case of Fullilove v. Police Jury, 51 La. Ann. 359, 25 South. 302, we had this to say:

"Do parochial authorities act as representatives of their respective 'parishes' when, under legislative provisions, they submit to a vote of the property taxpayers, either of the entire parish, or of a defined subdivision thereof, the question as to whether they shall be specially taxed in aid of a railway enterprise? Is such action and that which may incidentally and consequentially flow out of it 'corporate' action of the parish as a political body, and is a tax consented to at such an election, a 'parish tax'? An examination of the language of article 202 will show that the taxation therein referred to is taxation by the 'parishes.' The 'parochial authorities' are not mentioned. It is only in so far as they are called on to act as representatives of the parishes, in respect to matters binding the corporation, and as to which they may, in one sense, be said to be the parish itself, that they become connected with the subject-matter therein referred to. Article 242 of the Constitution, on the other hand, does not mention the 'parishes' themselves, but does mention the 'parochial authorities,' and constitutes them public ministerial agencies, 'to levy special taxes in aid of public improvements or railway enterprises' when consent to such taxes within the limitations fixed has been given as directed by that article by the owners of the property to be subjected to the tax. The designation of the parochial authorities as the public agency resorted to for the purpose of ascertaining and making effective the will of the people of a particular locality in respect to special taxes of the character referred to is simply as a matter of convenience. A special person or officers or board might have been charged with the performance of these duties. The purpose of such taxes is not in aid of matters falling generally and properly under the control of and within the scope of the legislative action of the parochial authorities, as representing

parishes, but partially withdrawn from such control. By force of affirmative limitations (subject to be reinstated to a certain extent by a vote of the people of the parish); but it is in aid of matters outside of, and never brought at all within the range of, legislative corporate action.' * * *

"Taxes of that character are made the subject of separate consideration by the framers of the Constitution; that they are affirmatively taken beyond and withdrawn from within the scope of legislative parish corporate action by article 242 of the Constitution, and are made to be governed and dealt with as independently provided therein."

And again, in V. S. & P. R. Co. v. Traylor, 104 La. 295, et seq., 29 South. 145, we say:

"In Fullilove v. Police Jury, 51 La. Ann. 359, 25 So. 302, we were called upon to examine, and to some extent pass upon, the provisions of the articles of, the Constitution herein copied, and declared that the special taxes referred to in article 242 constituted a class of taxes separate and distinct from those referred to in articles 202–204, 209; that the parochial authorities in levying those taxes occupied a different position from that which they occupied in levying taxes strictly and properly parochial; that in this latter matter they were acting, rather, as public agencies provided by the Constitution for carrying out the will of the taxpayers of the different parishes, when called into existence and made known as provided for by the Constitution in article 242, and in the statutes enacted thereunder. We think it plainly appears that these special taxes, when levied, are not levied as the result of the will, on that subject of the police juries acting as legislative bodies for and on behalf of the parishes, but that they are levied in enforcement of the will of the majority of the taxpayers, evidenced by their vote at a special election called for that purpose; the said expressed will of the majority bearing down, by force of constitutional power and authority, the expressed will of the minority. It will be seen that the levy of the tax is partly voluntary and partly coerced; that, to the extent it is voluntary, it is the result of the individual wills of a majority of the taxpayers, brought to bear directly upon the particular subject-matter through their own votes; and that, to the extent that it is coerced, it is the result of the individual wills of the minority brought to bear upon the particular subject-matter, having been made to yield to that of the majority, as the will of the minority of creditors in a respite

proceeding is overborne and made to yield to that of the majority. These special taxes therefore owe their origin to a different source through an entirely different process from that of the general taxes voted for and levied by the police jury acting as a legislative body. They not only differ from the general taxes in those respects, but the object to which the money levied by such taxation is to be applied is entirely different. * * * It is no part of the governmental duty of police juries to construct railroads, as it is to build a courthouse or a jail or to construct bridges. A courthouse, a jail or a bridge, when built, remains in kind, and becomes the property of the parish. A railroad when built through the aid of special taxes, remains the property of the corporation building the same. It passes out and beyond the control of the police jury, and the benefit received by the people of the parish through their contribution is only indirect and consequential. While the amounts levied for that purpose are in the nature of taxes, inasmuch as they are imposed to some extent, at least, under governmental authority, they are not taxes in the sense which the term bears with reference to strictly governmental taxes. They are contributions to the attainment of a certain purpose, but removed from being strictly donations by reason of their partially compulsory character. They are contributions made in invitum under constitutional authority based upon presumed benefits to be received."

While it is true that in the two cases quoted from above at length, the taxes levied were in aid of private railroad corporations (which partake of a quasi public character by virtue of being under the control of the police power of the state), yet the fundamental similarity to those in the present case in the manner of their imposition and the source of their authority cannot be denied. What was said as to the disposition of the money arising therefrom was simply an argument to emphasize the distinction between those taxes and taxes levied to enable the police jury to perform its usual and ordinary duties. In the very article 242 was linked the power to levy taxes "in aid of public improvements" with that of aid to "railway enterprise," when authorized by vote of the taxpayer.

Plaintiff relies upon the case of Billeaud v. Police Jury, 141 La. 957, 76 South. 161, in which was presented to this court, among other issues, the same question, wherein it was contended that the city of Lafayette, enjoying a similar exemption, should be included in a road district embracing the whole parish, and we there held that it could not be so included. However, that case was submitted without oral argument and upon briefs which did not press upon us the points now made in the attack upon its reasoning, and we did not go into the nature and origin of special taxation, based upon the authority of the vote of the taxpayer, as we have attempted to do in the present case. An analysis of the cases cited in support of our conclusions there, discloses that they were all cases involving the ordinary alimony taxes of the parish. They were State ex rel. Lacoste v. Vigneaux, 130 La. 424, 58 South. 135; Cade, Sheriff, v. Mitchell, 51 La. Ann. 1493, 26 South. 606, and State ex rel. Parish of Ouachita v. Hanna, Assessor, 142 La. 224, 76 South. 619. The first was a case in which the parish of Lafayette was attempting to collect a license tax from a resident of the city of Lafayette, which was clearly a tax for general revenue purposes, and which has been levied by police juries almost from the beginning. The same issue was presented in Sheriff v. Mitchell; while in the last (Parish v. Hanna) an attempt was being made to impose all of the alimony taxes of the parish of Ouachita upon property within the city of Monroe, on the theory that subsequent constitutional provisions had repealed the exemption in that city's charter, or that since the city had obtained a new charter in 1900, provisions of the Constitution of 1898 prevented the Legislature from granting exemptions of the character in question; and it was held that the contention was untenable.

It has been suggested that some municipalities have had their charters renewed in recent years with these same exemptions still recognized, and that the Constitution of 1921 specifically provides that, except as to the city of Monroe, nothing therein shall be held to affect them. But, in the case last mentioned (Parish v. Hanna), it was specifically held that the renewal of such provisions in subsequent acts of the Legislature was merely a perpetuation of the old exemption as it was granted in the first instance, and, being a special or local statute, was unaffected by the general terms of the later Constitution.

[3] Therefore, for the reasons given, we are constrained to overrule the case of Billeaud v. Police Jury, supra, and to hold that the exemption in the charter of the city of Lake Charles in no wise affects the power of the parish of Calcasieu to impose taxes throughout the entire parish for public improvements such as the one contemplated in this case, where the authority therefor is derived from the taxpayers.

### Public Purpose.

[4] The Act No. 68 of 1921 was passed to make effective certain provisions of the Constitution of the same year. Section 6 of article 14 of the present Constitution reads:

"Parishes and municipalities shall have the right to acquire property, either by purchase, donation or expropriation, for navigation canals; and for the payment thereof shall have the right to issue bonds, or certificates of indebtedness, in the same manner and subject to the same limitations provided in section 14 of this article."

Subsection (a) of section 14 of said article empowers parishes, as one of the subdivisions of the state, to levy taxes and issue bonds "when authorized by vote of a majority in number and amount, of the property taxpayers"; and subsection (b) further provides:

"Except as otherwise herein expressly provided, no bonds shall be issued by any parish

for any purpose other than for constructing and maintaining public roads, highways and bridges, constructing courthouses, jails, hospitals and other public buildings, and other works of public improvement, together with the necessary equipment and furnishings therefor, title to which shall be in the public, and for such other public purposes as the Legislature may authorize. * * * "

It would seem logical that since parishes are authorized to acquire property for navigation canal purposes, and to issue bonds to pay therefor when necessary, in accordance with the provisions of section 14, the intention was that they should also have all the necessary powers to make that ownership effective, such as the construction and operation of such canals. But that right is removed from doubt by the terms of subsection (b) above quoted, wherein it is said, after certain specific enumerations, that bonds may be issued "for such other public purposes as the Legislature may authorize."

In order to make clear the scope of Act No. 68 of 1921, we quote the title (which is nearly half as long as the body), italicizing those portions referring to the performance of the work by, with or through the federal government, as follows:

"An act declaring that the constructing, deepening, widening, improving and maintaining of navigation canals, navigation channels, and the deepening, widening, improving, and maintaining of existing streams, lakes, and other water courses for navigation purposes are works of public improvement title to which shall vest in the public, and for public purposes; authorizing the several parishes of the state to acquire property for such public improvements and public purposes; authorizing their governing authorities to make such works of public improvements; to enter into contracts for such work; to purchase machinery therefor and to perform and supervise such works and all other acts necessary in connection therewith, *to co-operate with state or federal government in performing such works, to receive from and furnish to the federal government financial aid and assistance for the making or completion and maintenance of such works;* authorizing the several parishes to incur debt and issue negotiable bonds

for such works, to call special elections, to levy taxes and to incur debt and issue and sell negotiable bonds therefor in accordance with law; to authorize the governing authorities of the several parishes to appoint a board of advisors; providing the method by which plans and specifications for such work shall be obtained and approved; providing how bids for such work shall be advertised and how such bids shall be made by those offering to perform such works; *and when such works are undertaken solely by the federal government, to acquire by purchase, donation or expropriation any property necessary to the federal government in the construction of such works and to donate to the federal government the property so acquired;* authorizing the police juries to execute such works with their own force and equipment and under their own supervision; providing for bonds to be given by successful bidders for such works; providing how special taxes imposed for such purposes shall be levied, assessed and collected and fixing the liens upon property to secure payment of such taxes; providing penalties for nonpayment thereof and the method of selling property to enforce collection of said taxes; providing the method of settlement and accounting by the sheriff and ex officio tax collector for all taxes collected under this act; providing compensation for the tax collector in collecting and paying over such special taxes; making the sheriff and ex officio tax collector and the surety on his official bond liable for taxes so collected and providing generally for all the purposes herein enumerated, and for the doing of all things necessary or incidental to such works of public improvement; providing the provisions of this act shall not apply to the Parish of Orleans."

The fact that the acquisition and construction of navigation canals by parishes and municipalities is authorized in the Constitution would, ordinarily, seem conclusive of the public nature of such work. In this particular instance, however, it is contended that, because the rights of way of that portion of the canal which is to be excavated are in the federal government and its jurisdiction in admiralty and for war purposes extends to the Calcasieu river, which also is to be improved and form a part of the waterway, the purpose for which the proceeds of the bonds and taxes are to be used is not

a public one within the meaning of the Constitution, and the use of the same by or in conjunction with the government would be a violation of section 12 of article 4 of the said Constitution.

It is evident that the constitutional convention had in mind, by the use of the language employed in subsection (b) of section 14, art. 14, quoted above, that there might be public purposes for which bonds should be issued and taxes levied other than those specifically mentioned wherein the title to tangible property would be in the public, for, after enumerating that species of property and "other works of public improvement," such as "courthouses, jails, hospitals, and other public buildings and other works of public improvement, together with the necessary equipment and furnishing therefor, title to which shall be in the public," it was provided that this kind of taxation and securities could be levied and used "for such other public purposes as the Legislature may authorize." It is not impossible or improbable that it might be vital to the welfare of some of the parishes to deepen the channel, by dredging or otherwise, of navigable streams within their boundaries,' which, if the national government could not be induced to perform, the people might wish, with its permission, to do for themselves. But in such cases, while the fee of the bed of the stream would be in the state, in virtue of its sovereignty, the jurisdiction of the government in admiralty and for war purposes would remain; yet the public nature of the benefit to the parish could not be denied.

[5] Wide latitude is due to the Legislature in the interpretation of the Constitution, and we are not justified in disturbing the action of that department of state government (which ranks equally in its sphere with our own) unless there is a clear violation of some restrictive provision of the organic law. With reference to the matter now under consideration it was expressly declared the province of the Legislature to carry section 6 and section 14, subsection (b) of article 14 into effect, in so far as navigation canals were concerned. This it has attempted to do by Act 68 of 1921, dealing with that subject, by in so many words declaring that the things to be done thereunder are in furtherance of a public purpose.

The ordinances of the police jury calling the election and promulgating the result do not disclose whether the work is to be done by the parish alone or in conjunction with the government, and there is no proof in the record on the subject, except that in the answer it is admitted that the title to the rights of way is in the government and the Calcasieu river is a navigable stream subject to its jurisdiction. However, from the argument and briefs, and in view of the provisions of Act 68 of 1921 permitting it to do so, we apprehend that the police jury may or intends to perform the work in conjunction with or to supply funds therefor to the agencies of the national government, and hence we think proper to meet all these issues.

Upon the subject of the title to the improvements resting in the public, our learned brother of the lower court has, in the course of an able written opinion, had this to say:

"It is further objected that the title to the proposed works will not vest in the public, as said to be required by section 14 of article 14 of the Constitution. That article, after naming a number of works of public improvement 'the title to which shall be in the public' concludes the list by adding 'and for such other public purposes as the Legislature may authorize.' While the title to the last class of public work is not clearly limited by these provisions it is expressly required by Act 68 of 1921 to vest in the public; and it is incumbent upon us to determine the legislative intent in the use of the word 'public.' It is contended by the plaintiff that the public referred to is the public of the parish by whom, and for whose benefit the work is being constructed; and it is

pointed out that the government of the United States, in whom vests the title to navigable waterways, is a public corporation, as defined by the law-writers, and that parishes and other subdivisions are prohibited by section 12 of article 4 of the Constitution from making donations for public corporations. But in the ordinary contemplation the government of the country is not viewed as a corporation; it is thought of as the government—an agent representing the public. The public can act only through its government; it acquires and holds property through its government; and its interests and those of its government are identical. This is the legislative interpretation, as shown by the Act 68 of 1921, and it is not so unreasonable that courts are authorized to overthrow it. Moreover, title in the government is public title, under article 453 of the Civil Code. It is this definition, recognized for generations under the civil law system, that must be said to have been intended by the framers of the Constitution."

We think this reasoning is sound. We must also bear in mind, the dual or interlocking character of our national and state governments under which there are certain spheres within which both do and must act together. In the matter of the selection of the legislative department or members of Congress, the election laws and machinery of the state are used, as is also true in the election of delegates to the electoral college to choose a President. In the judicial department, the courts of the two governments have concurrent jurisdiction in certain classes of cases, and the acts of Congress form as much a part of the law of each individual state as do its own statutes; while, in the particular field now under consideration—navigable waters —both have jurisdiction. As heretofore said, the state owns the fee of the beds of navigable streams under its inherent sovereignty, and has power to determine matters arising thereon or in connection therewith, save to the extent that Congress has, under authority of section 2 of article 3 of the federal Constitution, extended the judicial power "to all cases of admiralty and maritime jurisdiction." United States v. Bevans, 3 Wheat. 336, 4 L. Ed. 404. See, also, Rose's notes on this case for full annotation.

So that, at least as to the Calcasieu river, the state possesses and may delegate to the parishes a certain proprietary control and jurisdiction over its waterways. Though not exclusive, it is sufficient to stamp the work of carrying out and exercising that authority for the benefit of the citizens with a public character compatible with the requirements of the state Constitution.

[6] With regard to that portion of the canal to be constructed or excavated, while it is true that the government has taken the title to the soil in itself, the purposes and jurisdiction are the same as in the case of the river. We take judicial cognizance of the character and importance of the project known as the Intercostal Canal, extending through the states bordering on the Gulf of Mexico. Its value to the nation as a means of defense, in time of war, is perhaps no greater than it is to the states and local communities as an avenue of commercial intercourse and outlet to the sea, in times of peace. Its benefit to each and all is conceded. We take it that the Constitution makers must have had some purpose in eliminating the requirement that the title to such improvements should vest in the subdivision levying taxes of this character, and substituting the word public, and we can imagine no more appropriate case to sustain the wisdom of that action than the one now in hand. Counsel for plaintiff says that this change was not intended and did not have the effect of changing the requirement that the title should vest in the subdivisions, but that the same thing was meant by the use of the word public. Still, this argument makes no allowance for the deliberation with which a convention writing a Constitution is supposed to act, and that the very purpose of revising and redrafting it is to meet the requirements of a developing state. We do

not mean to say that it would yet be lawful for a parish or municipality to impose a tax upon its citizens for a purpose entirely beyond its jurisdiction and from which it and they would derive no benefit; but, in the present case, we think we have demonstrated both the large local benefit and a proprietorship sufficient to meet the requirements of the law. Then, too, as pointed out by the trial judge, the Constitution itself has in section 6 of article 14, recognized, by authorizing parishes to acquire property for navigation canals, the right to tax their people for a public improvement, which, in its very nature, must inure to the benefit of other communities, parishes, and even states; for a water course, the use of which was confined to a single parish might be of some benefit, but nothing like what it would when forming part of an outlet to other places—in fact, its value is increased correspondingly in proportion to its enlargement and extension to other sections. We also take cognizance of the great work performed by the port commissioners of the city of New Orleans in constructing what is called the Industrial Canal. Some eighteen to twenty millions of dollars have been and are being spent in providing a deep water channel between the Mississippi river and Lake Pontchartrain. For that purpose, taxes and revenues of almost every conceivable variety have been authorized, pledged and are being collected and applied. Yet its waters are to be used by the ships of all nations whose trade with this city, other portions of the state or other states of the union may send them here; but this in no wise diminishes its public purpose.

See the cases of Stockton v. Powell, 29 Fla. 1, 10 South. 688, 15 L. R. A. 42 et seq., in which this question has been elaborately and ably considered, and the authorities cited at length; also Cook v. Port of Portland, 20 Or. 580, 27 Pac. 263, 13 L. R. A. 534 et seq.; Lancey v. King County, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817.

The provision of our Constitution which it is said precludes the carrying on of the work of building the canal in the manner contemplated in this case, is section 12 of article 4, reading as follows:

"The funds, credit, property or things of value of the state or of any political corporation thereof shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private; nor shall the state, nor any political corporation, purchase or subscribe to the capital or stock of any corporation or association whatever, or for any private enterprise. Nor shall the state, nor any political corporation thereof, assume the liabilities of any political, municipal, parochial, private or other corporation or association whatsoever, except as otherwise provided in this Constitution; nor shall the state undertake to carry on the business of any such corporation or association or become a part owner therein; provided, the state, through the Legislature, shall have power to grant the right of way through its public lands for any railroad or canal; and provided, police juries and municipal corporations may, in providing for destitute persons, utilize any charitable institutions within their corporate limits for the care, maintenance and asylum of such persons; and all appropriations made to such institutions for the purpose aforesaid shall be accounted for by them in the manner required of officials intrusted with public funds."

We believe that what has been said above demonstrates the public nature, local benefit, and proprietary interest of the parish, in so far as state power and jurisdiction are able to confer it, in the enterprise in question. An improvement so extensive and whose benefits, in view of the joint powers and control of national and state authority, extend to all, could scarcely be undertaken from the resources of a small community like a single parish. We do not think it was the intention that the above wholesome provision, confining the state and its subdivisions to their own spheres of financial activity, should prevent the accomplishment of so important a work as the one under dis-

cussion. The purpose of the restriction was to prevent any of the agencies mentioned from going outside their own affairs and contributing to or assuming the liabilities of any other in matters which were peculiarly confined, under well defined distributions of power, to the other. The funds which are to be used, even if expended under federal supervision, are to pay for and improve that interest and for those benefits which we have heretofore mentioned; and, in doing so, the parish is not donating, lending or granting anything to the federal government, within the meaning of this article, although great advantage may accrue to it in the way indicated. The government merely becomes the agent, perforce of circumstances, of the parish for the accomplishment of an undertaking which the parish itself could not fully or conveniently perform.

See 15 Corpus Juris, 622; 22 Ruling Case Law, 607, § 2, and authorities in footnotes, as well as those above referred to.

For the reasons assigned, the judgment of the lower court is annulled and reversed, and the demands of plaintiff are rejected, with costs in both courts.

O'NIELL, C. J., dissents, being of the opinion that the judgment should be affirmed.