ELLIS, Judge.
The question presented on this appeal is whether the Parish Council of the Parish of East Baton Rouge, Louisiana, in its capacity as the governing authority of the Greater Baton Rouge Consolidated Sewerage District, had the legal right to require *274 contractors submitting bids on the construction of public sewerage facilities to pay minimum wage rates in accordance with the following contract provisions:
“8.12 Prevailing Wage Rates:
“Minimum labor rates for the construction of the proposed work shall be in accordance with the minimum labor rates prevailing in the Baton Rouge area, as established by the Secretary of Labor for each of the labor classifications employed on the project. The bid shall contain a statement that the prices quoted are based upon such prevailing wage rates and the District may require the Contractor to file a schedule of labor classifications and wage rates being paid, and shall further have the right to inspect and audit the books and cost data relating to the job in order to determine compliance with these provisions.”
The case was tried upon stipulated facts and they are not in dispute.
On May 19, 1959, the property tax payers situated within the Greater Baton Rouge Consolidated Sewerage District,[1] which said District had been created by resolution adopted April 8, 1951, voted funds for the construction of sanitary trunk sewers and disposal facilities within the District. In pursuance of this authorization of the property tax payers, the Parish Council employed consulting and design engineers and caused to be prepared certain plans and specifications for the construction of the sanitary trunk sewers and disposal facilities of the District.
After a favorable election' on May 19, 1959 for construction of the sewerage facilities, there followed on March 17, 1960 the bidding in accordance with the construction contract pursuant to public advertisement in accordance with law, and based upon plans and specifications contained in the contract documents which were made available to all contractors desiring to bid on the work, a copy of said contract documents are in this record marked Exhibit “B”. Among the various provisions, terms and conditions set forth in the contract document were those contained in Section 8.12, supra, and also marked as Exhibit “C”, attached to the contract documents and in evidence are listed in detail the prevailing minimum wage scales designated as the minimum wages to be paid on the sewerage project by the successful bidder. Exhibit “C” was the prevailing minimum wage rates for the Baton Rouge area required to be paid by the contractors on the Ryan Airport project. It was made by the Secretary of Labor of the United States under authority of the Davis-Bacon Act, 40 U.S.C.A. § 276a et seq., after surveys in order to determine the prevailing wages paid to the several classes of labor employed on a project similar to the Ryan Airport project. These determinations were required to be made on certain types of projects in which the United States Government has an interest or is participating in the costs. The Parish Council has never established a Commission or delegated any authority to anyone, nor established any rules or regulations for the making of a survey in order to determine the prevailing minimum wage scale in the Baton Rouge area, and being desirous of including in the contract for the public works a requirement of payment of minimum wage, according to a pre-determination of such minimum wage scales in the Baton Rouge area, and having participated in the Ryan Airport project along with the United States Government, the Parish Council contacted the Secretary of Labor of the United States for the purpose of getting the latter to make such a survey and establish the prevailing minimum wage scale in the Baton Rouge area.
The Secretary of Labor of the United States either refused or determined that *275 his office would not itself make the usual minimum wage pre-determination as no Federal funds were involved in the project, however, that office did advise that the work in question would be classified as “Heavy and Highway Construction” which was the same classification given the Ryan Airport project, in which the latest determination of minimum wage scales in the Baton Rouge area had been made under date of Nov. 23, 1959, and which had been given an expiration date of Feb. 24, 1960. The Parish Council therefore decided to adopt or use as the latest pre-determined prevailing minimum wage scale in the Baton Rouge area the one made and used on the Ryan Airport project. This prevailing minimum wage scale had been introduced as Exhibit “D”, and constitutes the same prevailing minimum wage rates in the Baton Rouge area, noted as Exhibit “C”, which is made a part of the Contract specifications for the work to be done in the Greater Baton Rouge Consolidated Sewerage District. For the sake of clarity we quote a part of the document, being Exhibit “C”, to-wit:
“Prevailing Minimum Wage Rates Baton Rouge Area
“For the purpose of applying Article 8.12 entitled ‘Prevailing Wage Rates’, the following represents the latest decision of the Secretary of Labor for minimum labor rates prevailing in the Baton Rouge area for the classifications indicated:
Per Hour
Carpenters $3,125
Cement masons 2.85
Ironworkers, structural 3.40
Ironworkers reinforcing 3.275
Painters, structural steel 3.00
Piledrivermen 3.125
Laborers:
Laborers, unskilled 1.42
Raker 1.62
Concrete spreader 1.62
Carpenters’ helper 1.62
Cement handler 1.62
Finishers’ helper 1.62
Form setter’s helper 1.62
Jackhammer operator 1.62
Painter’s helper 1.62
Pipelayer or tile layer 1.62
Tamper 1.62
Asphalt raker 1.62
Concrete shovelers 1.62
Formsetters, head or master high type pavement 2.02
Truck Drivers:
1 ton and under $1,605
1-1/2 ton to & including 2 ton, exclusive of dump trucks 1.805
Single axle dump trucks 1.855
Tandem axle dump 1.95
Winch lift 1.95
Transit mix 1.95
Floats and Pole trailer 1.95
Tractor trailers 1.95
Euclids and Laerin dump 2.05
Mississippi wagons 2.05
Power Equipment Operators:
Cranes all types 3.10
Stabilizers 3.10
Pulls all types 3.10
Paving machines 3.10
Mechanics 3.10
Scrapers 3.10
Bulldozers 3.10
Motor patrol 3.10
Gradall 3.10
Finishing machines 2.75
Bull floats 2.75
Subgrader 2.75
Small rubber tired tractorvator 2.75
Fireman 2.60
Mechanic helper 2,35
Oilers 2.20
Roller, steel wheel; roller pneumatic 2.75
Tractor, crawler; loader, front end 3.10
Tractor, wheel type; form grader 2.75“
It is further shown that eighteen bids were received on March 17, 1960 for the first project which was sewer construction work and that if E. A. Hardin of the engineering firm of Parsons, Brinckerhoff, Quade & Douglas, were called as a witness, he would testify that the lowest bid of Forcum-Lannon, Inc., was at least $50,000 under the estimate by him for the cost of the project on which these bids were received, in his capacity as Consulting Engineer for the District, which information was conveyed to the plaintiff after the bids were opened.
It is further shown that subsequent to the receipt of bids on March 17, 1960, representatives of the defendant appeared before the Parish Council and contended that it was without authority to include any predetermined minimum wage scale in its construction contract in view of the provisions of LSA-R.S. 38:2211 requiring that all contracts be let to the lowest responsible bidder, and the provisions of LSA-R.S. 23:822 establishing the public policy of the State to be that “Negotiation of terms and *276 conditions of labor should result from voluntary agreement between employer and employee”. It was further contended that the inclusion of pre-determined wage scale in contracts for skilled work violated the provisions of Article 4, Section 7 of the Louisiana Constitution, LSA, prohibiting the Legislature from passing any law “fixing the price of manual labor”.
After discussion in a public hearing on the issue, the Parish Council, on April 8, 1960, adopted the following resolution:
“Resolution
“I move as follows:
“1. For purposes of the pending contract, the Ryan Airport determination is the latest determination by the Secretary of Labor, applicable to sewer trunk work.
“2. The sewer contract specifications shall include the following provision, with reference to prevailing wages:
“The minimum wages to be paid laborers and mechanics shall be the prevailing wage for corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work, said prevailing wages to be determined by reference to the latest final published determination by the Secretary of the United States Department of Labor, applicable to the Baton Rouge area.
“The successful bidder is to make available to the Consulting Engineer complete records in connection with payment to employees during the time of the job in order to permit the Director of Finance to check as to adherence to the applicable wage scale.
“3. For the purpose of the work and for the purpose of applying determinations by the Secretary of Labor, the following shall apply:
“(a) Sewer trunk work shall be classified as heavy and highway construction.
“(b) Sewer treatment plants shall be classified as building trade construction.
“4. The Parish Attorney shall request the opinion of the Attorney General as to the legality of such specifications.”
The plaintiffs were advised by the Attorney General that it was not the policy of his office to render opinions where there was a serious probability of litigation. Following this advice, the Parish Council at a special meeting authorized the Parish Attorney to immediately bring suit for a declaratory judgment in the 19th Judicial District Court, to have the issue determined, wherertpon the plaintiff filed this suit alleging a justifiable controversy as between the petitioners on the one hand, and the defendant on the other hand, in that the former contended that they had the right to include pre-deter-mined minimum wage rates according to the latest determination by the Secretary of Labor for similar construction work in the Baton Rouge area in contracts for sewer construction work and the latter contending that the Parish Council was without such authority, and, in fact, that the attempted exercise of such authority would be invalid and unconstitutional.
The case was tried upon the facts generally outlined above together with the documents or exhibits referred to, as well as others, in the record, and the District Judge rendered judgment in favor of the Parish Council of the Parish of East Baton Rouge in its capacity as the governing authority of the Greater Baton Rouge Consolidated Sewerage District and the intervenors, and against the defendant, Louisiana Highway and Heavy Branch of the Association of General Contractors, Inc., declaring that the said Parish Council in such capacity had authority under its police power “to require that the contractors undertaking the work pay to their employees the prevailing wage rate as part of the specifications.”
As we understand from argument and brief, the defendant-appellant contends:
*277 1. That neither the Parish of East Baton Rouge nor the City of Baton Rouge, under the plan of government adopted August 12, 1947, including the amendments thereto, is empowered or authorized to require contractors submitting bids for the construction of the proposed sewerage facilities to pay, if awarded the contract, minimum wage rates in accordance with minimum labor rates prevailing in the Baton Rouge area.
2. That the provision is unconstitutional as it is violative of Article 4, Section 7 of the Constitution of the State of Louisiana, which prohibits the passage of any law “fixing the price of manual labor”.
3. That the provision in the contract numbered “8.12 Prevailing Wage Rates” is violative of the provisions of LSA-R.S. 38:2211 (lowest responsible bidder statute).
4. That the provision is also violative of the public policy of the state as expressed in LSA-R.S. 23 :822, which establishes the public policy of this state with reference to management and labor.
In view of the fact that the limits of the sewerage district lie partly within the City of Baton Rouge and the Parish of East Baton Rouge and although the Parish Council is designated as the governing authority of the sewerage district, we deem it advisable to explore the powers and authority granted and enjoyed by the City Council and the Parish Council under the plan of government of the Parish of East Baton Rouge and the City of Baton Rouge, effective January 1, 1949, amendments thereto, and any subsequent grant of power by the Legislature. It is agreed that there is no specific grant of authority in the plan of government, amendments thereto, or by legislative enactment which in direct language authorizes or empowers the City or Parish to provide in contracts for public work that the successful contractor-bidder pay minimum labor .rates in accordance with those prevailing in the Baton Rouge area. However, it is contended by the plaintiff that the provision is in the nature of a regulation of wages on public works and therefore is within the category of that which may be regulated under the police power and that both the City and Parish have been granted general police power.
A clear understanding of the definition of police power and what it generally includes and consists of would be beneficial, at this time, as it is necessary to the plaintiff’s contention and case that the contract provision in question relating to the minimum wage requirement be a proper subject for the exercise of the police power and that the City and/or Parish has been vested legally with such police powers as empower or authorize the regulation of wages to be paid by the successful contractor-bidder for the construction of the sewerage work as is set forth in Section “8.12” of the contract. Accordingly, we quote from 16 C.J.S. under the general heading of Constitutional Law, page 889, as follows:
“V. Police Power
“§ 174. Definition and Distinctions “Police power is the exercise of the sovereign right of a government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits.
“The police power appertains to such rules and regulations relating to personal and property rights as affects the public health, public safety, and public welfare. It is the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society. * * * ”
“§ 175. Nature and Scope in General
“a. Nature
“b. Scope
“a. Nature
“The police power is a governmental function, an in *278 herent attribute of sovereignty, which was born with civilized government, and which exists without any reservation in the constitution as an essential element in all orderly governments.
“The police power is a governmental function, an inherent attribute of sovereignty, and the greatest and most powerful attribute of government. It was born with civilized government, and was possessed by every state before the union was formed. Although the basis of the police power lies in the constitution which regards the public welfare, safety, and health of the citizens of the state, and although it may be given to the people of the state by the constitution, the power exists without any reservation in the constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society.
“In its nature it is very broad and comprehensive, elsewhere and otherwise described or defined as a very high power, and the laws enacted for the purpose of regulation thereunder may be impolitic, harsh, and oppressive without contravening the constitutional inhibition. It corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. It comprehends reasonable preventive measures no less than the punishment of perpetrated offenses; and it may act to prevent apprehended dangers as well as to control those already existing, the existence of power, opportunity, and temptation to do what is against public policy being a sufficient basis for legislative action. On it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property, and it has been said to be the very foundation on which our social system rests. It has for its object the improvement of social and economic conditions affecting the community at large and collectively with a view of bringing about ‘the greatest good of the greatest number.’
“Generally police power operates in the field of regulation, except possibly in some cases of emergency such as conflagration or flood when private property may be temporarily used or damaged or even destroyed to prevent loss of life or to protect the remaining property of an entire locality. It is founded largely on the maxim, Sic utere tuo ut alienum non laedas, and also to some extent on that other maxim of public policy, Salus populi suprema lex est. The constitution presupposes the existence of the police power and is to be construed with reference to that fact, and police regulations presuppose conditions which, unless controlled, will operate to a public disadvantage.
“b. Scope
Although it is difficult definitely to fix the bounds of the police power of the state, and although it is usually considered better to decide as each case arises whether or not the police power extends thereto, it may be said, as a general rule, that the possession and enjoyment of all rights are subject to a reasonable exercise of the police power, and that the police power extends to all great public needs.
*279 “Although it is liberally understood and applied, it is difficult, if not impossible, definitely to fix the hounds of the police power of the state, since it represents the state’s great reserve power. Indeed, it is deemed inadvisable to attempt to frame any definition which shall absolutely indicate the limits of the police power by including everything to which it may extend and excluding everything to which it cannot extend, since the courts consider it better to decide as each case arises whether the police power extends thereto, as the power is coextensive with the necessities of the case and the safeguards of the public interest. It has been said, however, that the exercise of the police power in any given direction is capable of definite expression.
“Notwithstanding the impossibility of exact definition of the scope of the police power, numerous efforts have been made to define its scope in a general way. It has been said that the scope of the power is as broad as the public welfare or necessity, and must be exercised in the interest thereof, that it is one of the least limitable of the powers of government, and that the police power is the broadest in scope of any field of governmental activity. Within the realm of police power the legislature may act in any matter not forbidden by the constitution expressly or by necessary implication. It extends to all matters which concern the regulation and control of the internal affairs of the state, and almost the whole of the great body of municipal law which establishes and enforces the duties of citizens to each other is embraced withiii and known as the police power.” See State Through Department of Highways v. Southwestern Electric Power Co., La.App., 127 So.2d 309-315, 316, 317.
It is thus clear from the above that all regulatory enactments by the state under its inherent general police powers, or its subdivisions, under the delegated authority included within its charter or by special' legislative enactment which promote the order, safety, health, morals or general welfare of society fall within the scope of their “police power” and constitute a valid exercise of such power, where the regulation or enactment is within constitutional bounds.
It is generally recognized that a municipality has no inherent police power, and, in the absence of an expressed or implied delegation of power, a municipal corporation cannot lawfully exercise police power. See 62 C.J.S. Municipal Corporations § 130, page 276. Also see City of Minden v. David Bros. Drug Co., 195 La. 791, 197 So. 505, 507, in which the Supreme Court of Louisiana stated, “A municipal corporation has no inherent power to enact police regulations, but derives it solely from the legislature and consequently can exercise only such power as is fairly included in the grant of powers by its charter. State v. Itzcovitch, 49 La.Ann. 366, 21 So. 544, 37 L.R.A. 673, 62 Am.St.Rep. 648”. Also see City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365.
The general law governing police juries is applicable to the plaintiff herein as the governing authority of the Parish of East Baton Rouge. This law is set forth by the Supreme Court of Louisiana in the case of Union Sulphur Co. v. Parish of Calcasieu, 153 La. 857, 96 So. 787, 788, as follows:
“(1) The very name ‘police jury’ implies a body or jury for the exercise of a limited portion of the governmental or police power, which, under uniform jurisprudence, exists to the extent only that it is delegated by positive legislation. Sterling v. Parish of West Feliciana, 26 La.Ann. 59; Bertrand v. Parish of .Vermilion, 28 La.Ann. 588; *280 State v. Dan Miller, 41 La.Ann. S3, 5 South. 258, 7 South. 672; State v. Harper, 42 La.Ann. 312, 7 South. 446; Police Jury, Lincoln Parish, v. Harper, 42 La.Ann. 776, 7 South. 716; Con-cordia Parish v. Natchez, etc., R. Co., 44 La.Ann. 613, 10 South. 809. It, or the parish which it represents, stands much lower in the scale of governmental agencies than a municipality, strictly speaking, and is often termed a quasi corporation. The chief distinction between such public bodies and municipalities, is that they are clothed with such governmental powers as they possess primarily and directly by the Legislature and without consent of the citizens or inhabitants immediately affected ; while the charters of municipal corporations are granted at the instance of the people who compose them. The former are mere auxiliaries of the state. McQuillin on Mun. Corps, vol. 1, p. 269 et seq. §§ 111 and 112, and authorities cited.”
Let us first consider the delegated powers of the City Council of the City of Baton Rouge, which are set forth in the plan of government of the Parish of East Baton Rouge and the City of Baton Rouge adopted August 12, 1947, effective January, 1949 and amendments thereto. The pertinent sections are as follows:
“Chapter 1
“Section 1.03. City of Baton Rouge.
“The City of Baton Rouge shall continue its existence as a political subdivision of the state and a body corporate under its charter as heretofore enacted except as the same is inconsistent with the provisions of this plan of government. * * *
“Chapter 2
“Section 2.04. Governing Body of City.
“The governing body of the City of Baton Rouge shall consist of the seven members of the parish council elected from the city and shall hereinafter be referred to as the city council.
“Chapter 3
“Section 3.02. Powers and Duties of the City of Baton Rouge and of the City Council.
“The City of Baton Rouge as extended by this plan of government shall continue to have all the powers and duties, except as provided in this plan of government, heretofore possessed by the City of Baton Rouge under its charter and the general laws of the state, and such other powers and duties not inconsistent with this plan of government as hereafter may be conferred or imposed on municipalities of the same population class. All provisions of the charter of the City of Baton Rouge not in conflict with the provisions of this plan of government are expressly continued in force and effect and henceforth, shall be subject to amendment only to the same extent and in the same manner as hereinafter provided for the amendment of this plan of government. All ordinances of the City of Baton Rouge in force prior to the first day of January 1949 shall, insofar as they are not inconsistent with this plan of government, remain in force and effect until amended or repealed by the city council.”
Under the language of the last quoted section it is clear that the City of Baton Rouge and City Council, in addition to the powers granted under the plan of government, expressly preserved and continued all the powers and duties “ * * * heretofore possessed by the City of Baton Rouge under its charter and the general laws of the state, and such other powers and duties not inconsistent with this plan of government as hereafter may be conferred or imposed on municipalities of the same population class. * * * ”
*281 Referring to Section 20 of Act 169 of 1898,[2] we find the following pertinent provisions :
“ * * * to exercise general police powers, in connection with any function of municipal government within the territorial limits of said city including the right, power and authority, to pass ordinances on all subject matters, including subject matters which the legislature has reserved to itself the right to regulate, but has not regulated or has not fully regulated, or which has reserved to itself the right to legislate, but has not legislated or has passed general or special laws which do not cover the entire subject matter, and on any and all other subj ect matters without exception, regardless of whether or not the Legislature has enacted special or general laws upon the same subject matter, subject only to the limitation that the provisions of said ordinances shall not directly conflict with the provisions of any State laws upon the same subject matter * * * ’>
Under the above quoted provisions the City of Baton Rouge through its governing authority, the City Council, is delegated full police power so that it may enact ordinances or provide regulations on all subject matters within the scope and bounds of its delegated “police power”. As to whether a minimum wage requirement is regarded as an exercise of the police power we find in the case of Bohn v. Salt Lake City, 79 Utah 121, 8 P.2d 591-594, 81 A.L.R., 215, the following:
“The validity of the provisions in respect to the minimum wage is also brought in question by the issues before us. The power of the city to make such restrictions is directly challenged. There is apparently some conflict of authority as to whether a municipality may prescribe a minimum wage. The decisions divide largely, if not wholly, upon the extent of authority conferred by statute upon municipalities in the respective jurisdictions. The power to fix a minimum wage and to prescribe the hours that shall constitute a day’s labor are quite generally regarded as an exercise of the police power. State v. Tibbetts, 21 Okl.Cr. 168, 205 P. 776; III McQuillin Municipal Corps. (2d Ed.) § 1081; State v. Livingston Concrete Bldg. & Mfg. Co., 34 Mont. 571, 87 P. 980, 9 Ann.Cas. 204. This power is inherent in the state.”
Also see State v. McNally, 48 La.Ann. 1450, 21 So. 27, 36 L.R.A. 533, wherein the Supreme Court of Louisiana held that the City of New Orleans was empowered to regulate by ordinance “ * * * the service and employment of all laborers and mechanics who are now or may hereafter be employed by the city of New Orleans, or by any contractor or subcontractor upon any of the public works of this city is hereby limited and restricted to eight hours in any one calendar day; * * * ”, (Emphasis added.) ■
There is no doubt but that the City of Baton Rouge, through its City Council, under the express provisions above quoted of its delegated powers was authorized and empowered, and legally capable of enacting, or inserting, in the contract in question, the regulatory provision, viz., “8.12” as to prevailing wage rates, supra, unless, of course, stricken with nullity as being in violation of other contentions made by defendant that it is violative of the competitive bidding law of the state, as well as the city and Parish of East Baton Rouge, and prohibited by the constitutional prohibition with regard to passing any laws fixing the wages of manual laborers, which will be hereinafter discussed.
We will next investigate the powers of the Parish Council of the Parish of East Baton Rouge, Louisiana, in order to ascer *282 tain whether this body was delegated under the provisions of the plan of government of the Parish of East Baton Rouge and the City of Baton Rouge and/or subsequent legislative acts, power and authority to regulate wages as was done under the provisions of 8.12 supra, pertaining to minimum labor rates for the construction of the proposed work. In respect to the powers granted under the provisions of the plan of government, we find the following:
“Chapter 1. General Provisions.
“Section 1.02. The Parish.
“East Baton Rouge Parish shall continue to be a political subdivision of the state and through the governing body thereof shall have all the privileges, powers and duties, not inconsistent with the provisions of this plan of government, heretofore possessed by East Baton Rouge Parish or the governing body thereof, or which may hereafter be conferred or imposed on parishes or the governing bodies hereof by the constitution and laws of the state and, in addition, such other powers and duties as are specifically conferred or imposed on East Baton Rouge Parish by this plan of government.
“Chapter 2. Governing Bodies.
“Section 201. Governing Body of East Baton Rouge Parish.
“The governing body of East Baton Rouge Parish, hereinafter referred to as the parish council, shall consist of seven persons elected at large from the City of Baton Rouge as extended by this plan of government; one person elected from the seventh and tenth wards and the portions of the sixth, eighth and ninth wards not included in the city; and one person elected from the fourth and fifth wards and the portion of the third ward not included in the city, in each case by the persons qualified to vote in such city and in each such district respectively.
“Chapter 3. Governing Bodies— Powers and Duties
“Section 3.01. Powers of the Parish Council.
The Parish council of East Baton Rouge Parish shall, in addition to the powers and duties conferred or imposed by other provisions of this plan of government, have: (a) All the powers and duties of East Baton Rouge Parish as provided in section 1.02 of this plan of government, (b) Exclusive authority, saving the authority of the State of Louisiana, throughout the parish, including the City of Baton Rouge, with regard to the constructing, opening, widening, extending, closing, narrowing, improving, grading, paving, repaving, adorning with trees, shrubs and vines, curbing, guttering, cleaning, repairing, and maintaining of streets, highways, boulevards, parkways, bridges, alleys and other public ways, and the grading, improving, constructing and reconstructing of sidewalks, including the authority to assess the whole or part of the cost of any street, alley or sidewalk improvement on the owners of the abutting property. To that end there are hereby transferred to the parish and to the parish council as the governing body thereof, except as specifically provided in this plan of government, all the powers and duties hitherto conferred or imposed on the City of Baton Rouge by its charter or by the general laws of the state relating to the above enumerated matters, but such transfer of powers shall not be taken to diminish in any respect the power and obligation of the city, from whatever source derived, to: (1) supply street lighting; (2) regulate traffic and the parking of vehicles, including the provision of facilities for off-street parking; (3) grant franchises or permits for the use of the *283 ■streets, highways, boulevards, parkways bridges, alleys and other public ways within the city; for pipes, poles, wire, conduits, street railways, bus lines, taxicabs and other vehicles for hire; (4) regulate the rates and conditions of service of any public utility or other person, firm or corporation holding any such franchise or permit; and (5) make charges and collect compensation for the privileges enjoyed by any such utility, person, firm or corporation. (c) Power to construct, own, maintain and operate airports, and to provide for their management and control by the department of public works, by a separate bureau in the office of the mayor-president, or by a board or commission.”
An examination of the powers conferred by legislative enactment, or delegation, upon police juries generally and particularly with reference to the Parish of East Baton Rouge prior to the adoption of the City-Parish Plan of Government reveals that they did not authorize or empower the Parish of East Baton Rouge to exercise general police power or specific police power as to enable it to regulate wages by fixing a minimum rate of wage as done by it under provision 8.12. of the contract in question. It is also clear that no such power is given to the parish council under the city plan of government, although the ■City of Baton Rouge and its governing body, the City Council, under a delegation of general police power were authorized and empowered to enact or insert such a provision in the contract as 8.12 with regard to minimum wages to be paid.
However, in 1958, the Legislature of the State of Louisiana enacted Act No. 150 which grants full power to the Parish of East Baton Rouge to require payment of a minimum wage on the public work in question as set forth in the contract provision 8.12 under a grant of general police power. The title of this act reads as follows :
“Authorizing and empowering the Governing Authority of the Parish of East Baton Rouge to enact all laws and ordinances necessary for the general welfare of said Parish and the inhabitants thereof; extending and delegating to the Governing Authority of said Parish a general grant of police power; authorizing and empowering the Governing Authority to adopt regulatory ordinances of all kinds, to define certain terms and offenses, and to suspend or revoke certain permits; declaring the authority so granted to be supplemental to and in addition to the authority and power granted to parishes or the governing bodies thereof under the Constitution and laws of the State of Louisiana; and providing authority to enforce ordinances adopted pursuant to the authority herein granted by fine and imprisonment, or both.”
Under Section 1 of this Act the Parish of East Baton Rouge is specifically authorized to enact any and all kinds of regulatory ordinances under the delegation of general police power. We quote the pertinent part of Section 1 of Act 150 of 1958 as follows:
“Section 1. The governing authority of the Parish of East Baton Rouge is hereby authorized to, and shall have the power to, enact all laws and ordinances necessary for the general welfare and convenience of said Parish, and the inhabitants thereof; and to this end, the governing authority of said Parish is specially authorized and empowered, but not limited hereby, to adopt ordinances to preserve the peace and good order of the Parish; * * * to maintain the cleanliness of the Parish and provide for the public health in every manner not inconsistent with the laws governing the State Board of Health; * * * to establish and maintain a sanitary sewerage system in the Parish or in such portions thereof as may be so developed as to require a sanitary sewerage sys *284 tem, including provision for the disposal thereof, * * *
Therefore, it is clear that the Legislature of the State of Louisiana has delegated to the Parish of East Baton Rouge the power to enact all laws and ordinances necessary for the general welfare and convenience of the Parish and the inhabitants thereof and without limitation thereby, the Parish was specially authorized and empowered to adopt other regulations with regard to specially designated subjects.
Therefore, the City of Baton Rouge and the Parish of East Baton Rouge under the delegation of general police power were authorized and empowered to insert in the contract in question the provision 8.12 requiring the payment of a minimum wage unless unconstitutional as contended by the defendant or prohibited under the competitive bidding law.
We will next consider defendant’s contention that the contract provision fixing a minimum wage to be paid by the successful contractor-bidder is unconstitutional as being violative of Article 4, Section 7 of the Constitution of the State of Louisiana, which provides:
“No law shall be passed fixing the price of manual labor, but the Legislature, through a commission or otherwise, may establish minimum wages for and regulate the hours and working conditions of women and girls, except those engaged in agricultural pursuits or domestic service.”
Where there is no specific constitutional prohibition the law generally recognizes the constitutionality of the provision regulating the minimum wages to be paid as provided in the contract provision now before the court. Campbell v. City of New York, 244 N.Y. 317, 155 N.E. 628, 50 A.L.R. 1473.
One of the arguments advanced by the plaintiff and/or intervenors in answer to the defendant’s contention of unconstitutionality of the provision in the contract is that the plaintiff is not passing any law. We find no merit in this answering argument for that which cannot be done directly as violative of a constitutional provision cannot be done indirectly. If no law can be passed fixing the price of manual labor, no provision fixing the price of manual labor can be inserted in the contract in question.
Another argument advanced by the plaintiff in its brief is that Article 4, Section 7 of the Louisiana Constitution, first appeared in substantially its present form in the Constitution of 1868 and that by reading this provision, it is apparent that the 1868 provision was included to avoid certain evils arising out of an attempt to fix the price of certain labor classifications in this earlier end of the Civil War Constitution; that it can hardly be said that the philosophy and obvious purpose of the original constitutional provision, even though carried over into the 1921 constitution, has any application to the present situation; plaintiff says this because the original prohibition was clearly designed only to prevent legislative interference with wages paid manual farm laborers in a predominantly agricultural state. We believe as particularly applicable as a full answer to this argument is that which was said by this court in Public Housing Administration v. Housing Authority of the City of Bogalusa et al., La.App., 129 So.2d 871, 873, which involved the interpretation of a constitutional provision as it affected an Act of the Legislature, and we quote:
“It is axiomatic that the legislature of the State is vested with the lawmaking power and has jurisdiction on all subjects within the limitations imposed upon it by the Constitution, and there is a presumption the legislative act is constitutional. The Court in interpreting the constitutionality of an act of the legislature should not give consideration to sociological, historical, economic, political or other motives where the verbiage of the Constitution *285 is plain, unequivocal and precise, but should apply the clear, not ambiguous provisions of the- Constitution which has been termed a legislative act by the people themselves in their sovereign capacity, therefore the paramount law. Indeed, our obligation in this regard is succinctly stated in LSA, Civil Code Article 13, as follows: ‘When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit.’ ”
The language in the constitutional provision is simple, clear and unambiguous. It prohibits the passage of a law fixing the price of manual labor and it is equally true that this same provision prohibits the fixing of the price of manual labor by the plaintiff under contract provision 8.12, supra, when said constitutional provision is the sole controlling factor or law to be considered, and no legislative enactment, ordinance or regulatory contractural provision, as in the case at bar, has been passed, enacted, or regulated by contract under and by virtue of a valid exercise of the police power vested in the governing authority. We will hereinafter discuss the effect of a valid enactment or regulation by one vested with full police power to so enact, or regulate, when said enactment, or regulation, is in direct violation of a prohibitory -constitutional provision, and particularly, in violation of Article 4, Section 7 of the Constitution of the State of Louisiana of 1921, which provides that “no law shall be passed fixing the price of manual labor.” In view of the fact that the parties are requesting a declaratory judgment it might be well or of assistance to discuss the constitutional prohibition as it affects the minimum wage established for the various classifications of laborers shown by an exhibit which is a part of the evidence offered in the case. We must first ascertain if any of the laborers as classified on the exhibit are to be considered as manual laborers or mechanics and in order to do this it is necessary that we review to some extent the law and jurisprudence.
We find an excellent discussion of the law and rule to be followed in distinguishing whether a laborer is following a mechanical pursuit, a profession or is to be classified only as a manual laborer in the case of State v. Cohn, 184 La. 53, 165 So. 449, in which Justice Higgins was the organ of our Supreme Court. In this case the State of Louisiana instituted proceedings against the defendant for an occupational license tax alleging that he was engaged in the City of New Orleans in the profession of “beauty specialist”. The defendant pled an exemption from such a tax, under the express provisions of Section 8 of Article 10 of the Constitution of Louisiana of 1921, which read as follows:
“Section 8. License taxes may be levied on such classes of persons, associations of persons and corporations pursuing any trade, business, occupation, vocation or profession, as the Legislature may deem proper, except clerks, laborers, ministers of religion, school teachers, graduated trained nurses, those engaged in mechanical, agricultural or horticultural pursuits or in operating sawmills.”
The Court stated that Section 1 of Act 135 of 1924, described the kind of calling in which the defendant was engaged as “Cosmetic Therapy of Beauty Culture and Hairdressing,” and forbade persons to engage therein “unless they shall have been licensed to practice such profession.” The court also quoted the legislative definition of “cosmetic therapy” which was classified as professional and commented that it was clear that the Legislature could not by a mere definition change a calling which falls in the category of a mechanical pursuit and classify it as a profession in order to subject those engaged therein to a license tax, as that would be in plain violation of the constitutional limitations. The court therefore stated that it would have to determine what were the accepted definitions of the word “profession” and the *286 phrase “mechanical pursuit”. As the list ■of classified laborers as stipulated by the parties and placed in evidence contains no professional employees and our question is to distinguish between one engaged in a mechanical pursuit from one engaged in solely manual labor, we will consider that portion of the opinion dealing with those engaged in a mechanical pursuit. In dealing with the subject in which we are interested the organ of the Supreme Court stated:
“ ‘Mechanical pursuit’ is defined in Ballentine’s Law Dictionary as:
“ ‘A business, calling, or occupation which cannot be utilized unless resort is had to the use of some machinery •or instrument of force, or appliance of power, in aid of manual work, in some physical undertaking, in which the intervention or interaction of a superior mind is not required. That is, the occupation must he one by which the object realized is not dependent for its confection on the exertion of a controlling intellect, but rather on the ■adaptation of some helping mechanism, •or use of some auxiliary tool or instrument. See City of New Orleans v. Robira, 42 La.Ann. 1098, 8 So. 402, 11 L.R.A. 141.’ (Italics ours.)
tfc >¡í j}c >}j
“In the case of State v. Chicago Hat Works, 174 La. 814, 141 So. 844, it was held that one engaged in the calling of cleaning, repairing, and blocking hats with the aid of tools and machinery was engaged in a mechanical pursuit.
“In City of New Orleans v. Bayley, 35 La.Ann. 545, the court held that a plasterer was exempt from the tax under the mechanical pursuit clause.
“In the case of City of New Orleans v. Lagman, 43 La.Ann. 1180, 10 So. 244, it was held that:
“ ‘A mechanic [a carpenter] who contracts and shapes materials with his own hands is engaged in a mechanical pursuit.’ [Brackets ours.]
“In the case of State v. Hirn, 46 La. Ann. 1443, 16 So. 403, the court said:
“ ‘The occupation of the barber is mechanical, exempted from a license tax by the constitution.’
“In the case of State v. Dielen-schneider, 44 La.Ann. 1116, 11 So. 823, it was held:
“That the occupation of a barber is mechanical admits of no dispute. His labor is manual, using with his hands the instruments required for his employment. He comes within the definition of a mechanic, and his pursuit has been recognized as mechanical by the decisions of this court.
“At the time those two decisions were .rendered, barbers were not regulated under the police power of the state as a health measure, but since that time they have been regulated similarly as beauticians by the provisions of Act. No. 247 of 1928.
“Since that act of the Legislature was passed, we had for consideration before this court, on application for writs of certiorari, the question of whether or not a barber was engaged in a profession within the meaning of a zoning ordinance. In other words, if the barber was engaged in a profession, then he could open his place of business in the zoned neighborhood; otherwise he was prohibited from doing so. The trial judge issued an injunction, restraining the barber from opening and operating his shop on the ground that he was not engaged in a profession. He applied to this court for writs, which were refused, on June 12, 1933, on the ground that no manifest error had been committed. City of New Orleans v. V. R. Minton et al., No. 32437.
* * * * * *
“(2,3) The test as stated by the foregoing definitions and authorities is whether or not the intellectual quality *287 predominates over manual skill in performing the duties of the particular calling. If the mental aspect is controlling, then the pursuit is classified as a profession. If skill in the manipulation of the hands, tools, and machinery is emphasized over the mental side, then the calling is classified as a mechanical pursuit.
“(4) Of course, there are certain callings which require both intellect and skill, but in some instances the pursuit is classified or listed as a 'profession’; i. e., artists, dentists, surgeons, etc. There may be instances where it would be extremely difficult to determine which of the two qualities was most emphasized or required in the proper carrying out of the duties of the occupation.
“All skilled artisans engaged in mechanical pursuits by the very nature of their occupation require some education, periods of apprenticeship, and experience, even though the state or the subdivision thereof has not passed legislation to regulate them. It is significant that we have been unable to find any cases where the state attempted to enforce payment of a license tax from. those classes of persons; i. e., machinists, coppersmiths, boiler makers, etc.
“(5) While we fully appreciate that the statute in the instant case requires the defendant to have the equivalent of a first year’s high school education and that it requires training and apprenticeship to qualify her to engage in this line of endeavor, it is our opinion that the skill required of her in the use of her hands and the handling of tools and machinery predominates over the intellectual and mental requirements. She is therefore entitled to the benefits of the constitutional exemption in her favor, and cannot be compelled by legislative act to pay a license tax.”
While we should have a stipulation of facts or oral evidence as to the exact duties of the various classifications of laborers in order to correctly and definitely decide into which classification each should be placed, we do not believe there is any doubt but that all the laborers shown on said list, except “laborers, unskilled $1.42 per hour”, would be correctly classified as mechanics or engaged in a mechanical pursuit under the above quoted definition, i. e., their occupation is one dependent “on the adaptation of some helping mechanism, or use of some auxiliary tool or instrument”, and not one dependent for its confection on the exercise of controlling intellect. We do not mean to hold that one who merely rolls a wheel barrow or digs with a spade is a mechanic. Such an employee is a manual laborer and could not without training or experience pick up, for example, the tools of a barber or a carpenter and do barbering or carpentry. In a broad and general sense the term “laborer” may include any person who performs physical or mental labor under any circumstances. However, in construing the term “laborer” it has been held by the courts of this State that mechanical engineers, electrical engineers, clerks, agents, etc., whose employment is associated with mental labor and skill are not considered as laborers. State ex rel. I. X. L. Grocery Co. v. Land, 108 La. 512, 32 So. 433, 58 L.R.A. 407. Further, those who exercise skill in the manipulation of the hands in connection with tools and machinery and such skill predominates over the application of their mental qualities then they are held to be artisans or mechanics and not laborers. In this classification are barbers, plasterers and carpenters. See citations at page 452 of 165 So. in State v. Cohn, supra. Thus it would seem that a person who does nothing but “manual labor” (the term employed in Article 4, Section 7 of the Louisiana Constitution) is one who has no special knowledge (profession) or skill (mechanic) and the work he does, even though he might at times employ tools in his work (such as wheelbarrow or shovel) can be done by any able bodied person without their having *288 any special knowledge or skill in the use of such tools. See Cole v. Grant, 144 La. 916, 81 So. 398, 399, wherein the court stated:
“A laborer has been held, by various courts, in a restricted sense, to be one who performs manual labor, menial or physical exertion, labor, or toil, not requiring special accuracy, knowledge, skill or training, for hire or wages, under the direction of his employer, master or superior, and hence distinguished from an artisan, professional man, or skilled workman
Also State ex rel. I. X. L. Grocery Co. v. Land, 108 La. 512, 32 So. 433, 58 L.R.A. 407. It is not necessary that we delve further into the distinction between manual laborers, mechanics or those engaged in professions. The constitutional prohibition against passing any law fixing the price of manual labor would be applicable to all employees classified as shown on the list in evidence as laborers, unskilled, for which the rate was fixed at the rate of $1.42 per hour were it not for the fact that the regulation of wages is generally considered as an exercise of the police power, and when validly and legally exercised, constitutional prohibitions or inhibitions, viz., Article 4, Section 7 of the Constitution of the State of Louisiana and of Section 2 of Article 1 of the Constitution of the State of Louisiana which states that: “no person shall be deprived of life, liberty or property, except by due process of law” and the Fourteenth Amendment to the Constitution of the United States, which provides: “no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of the right, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws” do not operate as limitations upon the police power of the state or any other subdivisions which have been delegated general police power, as in the case at bar, to enact and enforce laws and regulations to protect the public health and safety and promote the general welfare of the people. These constitutional protective inhibitions must of necessity yield to the valid exercise of the police power. This was the specific holding of the Louisiana Supreme Court in Board of Barber Examiners of Louisiana v. Parker, 190 La. 214, 182 So. 485, 503, 504(5). This case involved a constitutional attack upon Section 12 of Act No. 48 of 1936, commonly known as the Barber Act, in which the Board of Barber Examiners of Louisiana were given the power “to approve price agreements establishing minimum prices for barber work, * * * This section was attacked upon the ground that it was violative of Article 4, Section 7 of the Constitution of the State of Louisiana, which provides that “no law shall be passed fixing the price of manual labor” and of Article 1, Section 2, of the Constitution of the State of Louisiana, and of the Fourteenth Amendment of the Constitution of the United States, both of which have been hereinabove quoted.
In dealing with the constitutional questions outlined the Supreme Court of Louisiana with the late Justice Higgins as the organ of the Court stated and held:
“(1) It is not seriously insisted that this is an attempt to fix the price of manual labor for it is well settled by the jurisprudence of this State that the occupation of a barber is classified as a mechanical pursuit and not as manual labor. State ex rel. Grocery Co. v. Land, 108 La. 512, 32 So. 433, 58 L.R.A. 407, 92 Am.St.Rep. 392; Cole v. Grant, 144 La. 916, 81 So. 398; Groves & Rosenblath v. Atkins, 160 La. 489, 490, 107 So. 316; State v. Hirn, 46 La. Ann. 1443, 16 So. 403; State v. Die-lenschneider, 44 La.Ann. 1116, 11 So. 823; State v. Cohn, 184 La. 53, 165 So. 449; see also Devney’s Case, 223 Mass. 270, 111 N.E. 788.
“The second contention is that the provisions of Section 12 of the statute *289 deprive the defendants of their liberty and property, without due process of law, in violation of the above quoted provisions of the State and Federal Constitutions.
“(2) An Act of the Legislature is presumed to be legal until it is shown that it is manifestly unconstitutional and all doubts as to its validity are resolved in favor of its constitutionality. Becker Steel Co. v. Cummings, 1935, 296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54; Alaska Packer’s Ass’n v. Industrial Acc. Commission, 1935, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044; Borden’s Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; Life & Cas. Ins. Co. v. McCray, 1934, 291 U.S. 566, 54 S.Ct. 482, 78 L. Ed. 987; New Orleans v. Louis Robira, 1890, 42 La.Ann. 1098, 8 So. 402, 11 L.R.A. 141.
“(3) The above rule is strictly observed in cases where the Legislature enacted a law in the exercise of its police power. Slaughter House Cases, 1873, 16 Wall. 36, 21 L.Ed. 394; Euclid v. Ambler Realty Co., 1926, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L. R. 1016; Thomas Cusack Co. v. Chicago, 1917, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472, L.R.A. 1918A, 136, Ann.Cas. 1917C, 594; Hadacheck v. Sebastian, 1915, 239 U.S. 394, 36 S.Ct. 143, 60 L. Ed. 348, Ann.Cas. 1917B, 927; Erie R. Co. v. Williams, 1914, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A., N.S., 1097.
“(4) The Legislature is presumed to have acted only after a thorough investigation and upon finding that the interest of the public required the legislation in question. Durand v. Dyson, 1916, 271 Ill. 382, 111 N.E. 143, Ann. Cas.l917D, 84; Townsend v. Yeo-mans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210; Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177, 178; Borden’s Farm Products Co. v. Baldwin, supra.
“(5) It has been held many times that the Fourteenth Amendment of the Constitution of the United States, U. S.C.A.Const. Amend. 14, and Article 1, Section 2 of the Constitution of Louisiana, prohibiting the deprivation of life, liberty or property without due process of law do not operate as limitations upon the police power of the State to enact and enforce laws and regulations to protect the public health and safety and promote the general welfare of the people. These constitutional protective inhibitions must of necessity yield to the valid exercise of the police power by the State. Nebbia v. People of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Pacific Gas & E. Co. v. Police Court, 1919, 251 U.S. 22, 40 S.Ct. 79, 64 L.Ed. 112; Mountain Timber Co. v. Washington, 1917, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642; Gioz-za v. Tiernan, 1893, 148 U.S. 657, 13 S.Ct. 721, 37 L.Ed. 599; Mugler v. Kansas, 1887, 123 U.S. 623, 8 .S.Ct. 273, 31 L.Ed. 205; New Orleans v. Postek, 1935, 180 La. 1048, 158 So. 553; Lacoste v. Department of Conservation, 1922, 151 La. 909, 92 So. 381, affirmed in 1924, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437; State v. McCormick, 1918, 142 La. 580, 77 So. 288, L.R.A.1918C, 262; State v. Schlemmer, 1890, 42 La.Ann. 1166, 8 So. 307, 10 L.R.A. 135; Garrett, Blanks, et al. v. Aby, 47 La.Ann. 618, at page 630, 17 So. 238 (Citing Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 * * * Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; Pickles v. Dry Dock Co., 38 La.Ann. 412; Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346; Metropolitan Board v. Barrie, 34 N.Y. 657, 662); Allopathic State Board of Medical Examiners v. Fowler, 50 La. Ann. 1358, 24 So. 809; Chicago B. & Q. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328; State v. Pays-san, 47 La.Ann. 1029, 17 So. 481, 49 *290 Am.St.Rep. 390; State v. Morris, 47 La.Ann. 1660, 18 So. 710; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A. L.R. 1469; New State Ice Co. v. Lieb-mann, 285 U.S. 262, 52 S.Ct. 371, 76 L. Ed. 747; Lake Shore & M. S. R. Co. v. Ohio, 173 U.S. 285, 292, 19 S.Ct. 465, 43 L.Ed. 702, 704; Chicago & A. R. Co. v. Tranbarger, 238 U.S. 67, 77, 35 S.Ct. 678, 59 L.Ed. 1204, 1211; Chicago B. & Q. R. Co. v. Illinois, 200 U.S. 561, 592, 26 S.Ct. 341, 50 L.Ed. 596, 609, 4 Ann.Cas. 1175; State v. DeVerges, 153 La. 349, 95 So. 805, 27 A.L.R. 1526; Bacon v. Walker, 204 U.S. 311, 317, 27 S.Ct. 289, 51 L.Ed. 499.”
Also see State Through Department of Highways v. Southwestern Electric Power Co., supra, 127 So.2d at page 317; State v. Legendre, 138 La. 154, 70 So. 70, L.R.A. 1916B, 1270.
Again in City of New Orleans v. Postek, 180 La. 1048, 158 So. 553, at page 555, the Supreme Court of the State of' Louisiana approved of this doctrine by citing prior authority when it stated:
“In State v. McCormick, 142 La. 581, 582, 77 So. 288, 289, L.R.A.1918C, 262, it is said:
“ ‘ “The legitimate exercise of the police power is not subject to restraint by constitutional provisions for the general protection of rights of individual life, liberty and property.” State v. Schlemmer, 42 La.Ann. 1166, 8 So. 307, 10 L.R.A. 135. And the Fourteenth Amendment to the Constitution of the United States does not interfere with the proper exercise of that power. 6 R.C.L. pars. 193, 194; L’Hote v. New Orleans, 177 U.S. 596, 20 S.Ct. 788, 44 L.Ed. 903.
“ ‘ “However difficult it may be,” say the authorities, “to render a satisfactory definition of ‘police power,’ there seems to be no doubt that it extends to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals.” R.C.L. par. 199.’ ”
In the case cited of State v. Schlemmer, supra, the Supreme Court of the State of Louisiana in dealing with the city ordinance having for its object the prevention of the use of unwholesome well water in the making of bread for public distribution and consumption, in answer to a constitutional attack upon the ordinance (1) that it operates the taking of property without due process of law, and without adequate compensation, in violation of the Constitution of the State and of the United States; (2) that it is class legislation, discriminating, without reason, against a particular class of citizen held:
“1. The proposed suppression of the well on defendant’s premises is not an exercise of the right of eminent domain by taking private property for public use without just compensation, or due process of law, within the purview of the constitutional provisions above referred to. It is a distinct exercise of the police power, as to which we have heretofore said: ‘It is universally admitted that, however broadly these principles may be expressed, there exists, ex necessitate rei, in every government, the power to impose restrictions upon individual rights of life, liberty, and property, which it is not within the meaning or intent of such provisions to prohibit or restrain. * * So universal and long continued has been this construction of constitutional inhibitions against governmental deprivation of life, liberty, and property of citizens, that it may now be considered as written into every constitution.’ State v. Judge, 39 La.Ann. 138, 1 South.Rep. 437. If, then, the ordinance under consideration is a proper and lawful exercise of the police power, the constitutional inhibitions in-
*291 voiced have no application thereto; if it is not such an exercise of that power, there is no other ground on which it can stand for a moment.” [42 La.Ann. 1166, 8 So. 308].
In addition to the quote in State v. McCormick, supra, we find the Court with Chief Justice Monroe as its organ in that case also stated:
“(2) There are other decisions of the same august tribunal, and of the other courts of the country, to the effect that the aid of the judiciary may be invoked to protect rights guaranteed by Constitutions from the arbitrary abuse of the police power, but the principle remains that the legitimate exercise of that power is a function of the legislative department, with the discharge of which the judiciary has no mission to interfere, and, as we are of the opinion, that in the present instance the power has been legitimately and properly exercised, we conclude that the statute complained of should be sustained.” [142 La. 581, 77 So. 289].
Therefore, under the settled jurisprudence unless it be shown that the exercise of its general police power by the plaintiff herein constituted an unreasonable or arbitrary abuse of that power the judiciary “has no mission to interfere.” On this question we must remember that the plaintiff was delegated full general police powers, equal to that of the state, and that the regulation or fixing of the minimum wage according to the prevailing wage rate in the area is regarded as an exercise of police power. As to whether it was an unreasonable or arbitrary abuse of the exercise of the police power the defendants do not contend that the wage scale set opposite each class of labor is too high, too low, and therefore arbitrary and unreasonable but that the action of the Parish Council, plaintiff herein, was an absolute and complete delegation of power and authority to an agency in the federal government to determine a wage in connection with a matter over which they had no authority, control or power, and that the same action had been held unconstitutional in the case of Crowly v. Thornbrough, Commissioner of Labor of State of Arkansas, 226 Ark. 768, 294 S.W.2d 62, 66, in which that court held:
'“The Act fails to establish a standard or formula by which a wage scale may be formulated; but rather delegates to the Secretary of Labor of the United States .the right to fix the minimum wage scale to be paid in a particular area of this State. The State retains no control over the Secretary of Labor of the United States, therefore the Act violates Article 4, Sections 1, 2 and Amendment 7 to our State Constitution. Numerous decisions from other states have held similar legislation to be unconstitutional delegation of legislative authority to an agency of the United States Government. Hutchins v. Mayo, 143 Fla. 707, 197 So. 495, 133 A.L.R. 394; Smithberger v. Banning, 129 Neb. 651, 262 N.W. 492, 100 A.L.R. 686; State v. Gauthier, 121 Me. 522, 118 A. 380, 26 A.L.R. 652; Holgate Bros. Co. v. Bashore, 331 Pa. 255, 200 A. 672, 117 A.L.R. 639.”
We do not find any merit in the defendant’s contention of illegal delegation of authority to the federal government. It is admitted that the federal government was requested to make a survey but it refused' to do so as it was without authority. The Parish Council then took it upon itself to use as the prevailing minimum wage in the area the scale which had been made by the federal government upon the Ryan Airport project, which were the “latest final published determination by the Secretary of the United States Department of Labor applicable to the Baton Rouge area.” The adoption of the wage scale was the action of the plaintiff and they stand as reasonable for they have not been questioned on this ground.
*292 The next question that confronts us is the contention of the defendant that the contract provision in question establishing a minimum wage according to prevailing wage rates in the area violates the provisions of LSA-R.S. 38:2211, the pertinent portion of which reads as follows:
“All public work to be done, exceeding the sum of one thousand dollars, by any public corporation or political subdivision of the state or for the purchase of materials or supplies to be paid out of public funds shall be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans, and specifications as advertised. * * * ”
We also find in the plan of government of the City of Baton Rouge and the Parish of East Baton Rouge in Section 4.09, Competitive Bidding, the following provisions:
“Before making a purchase or contract the purchasing agent shall give opportunity for competitive bidding under such rules and regulations, not in conflict with general law, as may be established by the parish council and city council respectively. With the approval of the city council where the purchase is to be made with funds appropriated by it, and the parish council in all other cases, the purchasing agent may reject any or all bids and read-vertise for bids; provided that competitive bidding shall not be required in the case of contracts for professional services and for services for which the rate or price is fixed by a federal or state authority authorized by law to fix rates or prices.”
In addition, the Baton Rouge City Code, adopted September 19, 1951 and effective November 1, 1951, provides in Title 1, Part 3, Section 701, as follows:
“All public work to be done by, services to be performed for (except those excluded by or under Section 15 hereof), the Parish of East Baton Rouge or the City of Baton Rouge, and all purchases of materials and supplies for such agencies, or any other agency utilizing the services of the Purchasing Division, exceeding the sum of $500.00 to be paid out of public funds shall be advertised as hereinafter provided and let by contract to the lowest responsible bidder who has bid according to the contract, plans and specifications, as advertised. Hereafter when the words ‘public work’ or ‘work’ are used in this ordinance, they shall also be construed to mean services to be performed.”
The question presented is whether the contract provision, “8.12” requiring the payment by the successful contractor-bidder of minimum labor rates for the construction of the proposed work, in accordance with the minimum labor rate prevailing in the Baton Rouge area, is violative of the above quoted statute, charter provision and ordinance and therefore null and void.
We quote from 63 C.J.S. Municipal Corporations § 1148, page 811, as follows:

“Necessity or Propriety

“a. In general
“b. Application of requirement
“a. In General
“Competitive bidding is frequently required in the letting of contracts for municipal improvements. Failure in this respect in violation of statute renders the contract void.
“It is usually provided by statute, charter, or ordinance that, at least in certain cases, a municipal contract for a public work or improvement shall be let on competitive bidding. Such a provision, when applicable, is mandatory; unless it is complied with, the contract is void, and, as discussed infra § 1166, there can be no recovery against the municipality on the basis of an implied contract. This is true both of provisions requiring a notice, re *293 quest, or advertisement for bids and of provisions requiring the contract to be awarded to the lowest responsible bidder, as the object of such provisions, considered together, is to procure competitive bidding for public improvement contracts, and thereby to safeguard public funds by preventing fraud, favoritism, and extravagance in their expenditure. Persons entering into contracts with a municipality are charged with notice thereof and with knowledge that it would be impossible for the municipality to return the materials and work furnished under the contract.
"On the other hand, the letting of a municipal contract for a public improvement on competitive bidding is not necessary when not required by charter, statute, or ordinance, but, even though not required, when not prohibited by charter or statute, the letting of a contract by this method is permissible. Sometimes provision is made whereby a requirement of competitive bidding may be dispensed with by the council. Such a power conferred on the council cannot be delegated, and in order to dispense with the requirement it is essential that the prescribed action by the council shall be taken. Where bidding may be dispensed with by approval of the mayor, such approval comes too late when given after the contract is let.” Emphasis added.
We also quote from 63 C.J.S. Municipal Corporations § 1149, page 815, as follows:
“a. In General
“The competitive bidding requirement for municipal improvement contracts is violated by any scheme or device which prevents competition among prospective bidders.
“Provisions requiring the letting of a municipal contract for a public improvement on competitive bidding are violated by any scheme or device which prevents, or tends to prevent, or restrict, or suppress, competition among persons who may desire to become bidders, or which is designed to promote favoritism, or which affords opportunity for competition in form only, and not in fact.
“Where competitive bidding is required, it must not be destroyed or impaired, and the officer, board, or body charged with authority and duty in the premises must determine in each case what competition the nature of the case will admit, endeavor to secure the best competition possible in the circumstances of the particular case, pursue the best method possible to secure it, and accord the same treatment to all bidders. To this end, conditions necessary to secure fair and reasonable opportunity for competition are properly proposed. Generally restrictions or conditions imposed on bidders which tend to increase the cost of the work are held to violate the requirement of competitive bidding or of letting to the lowest responsible bidder.[54] However, not every restriction or limitation on the bidding constitutes an illegal restraint on competition. Conditions imposed on bidders do not violate the requirement unless, as a matter of fact, they increase the cost, and the courts will not interfere where the proper board imposes only such conditions as allow a fair and reasonable opportunity for competition; it is sufficient if an opportunity for competitive bidding is afforded, even though only one bid is filed and there is no actual competition.
*(» 5jí íjí «jí
“Wage and hour restrictions. Conditions or restrictions on bidders calling *294 for the payment of a minimum wage to their employees have been held invalid as violating the requirement for competitive bidding or the letting of the contract to the lowest responsible bidder.[64] Such restrictions or conditions have been upheld, however, where there is no such requirement,[65] particularly where under the circumstances of the particular case the cost of the improvement to the municipality is not increased by such restrictions.[66] ”
From this same volume of C.J.S. § 1162, page 844, — Provisions as to Particular Matters (1) In General, we quote:
.“Reasonable provisions prescribing the duties, obligations, and liabilities of the Contractor, or imposing conditions or restrictions on him, may be incorporated in a municipal contract for an improvement, provided they do not violate any law or rule of public policy, do not deter prospective bidders from bidding for the contract, and do not increase or naturally tend to increase the cost of the work,[31] and thereby add to the burden of the property owners and taxpayers.[32] * * *
* * * * * *
“Labor, hours of work, and wages. * * * Except where such restrictions are considered as violating the requirement that contracts be let to the lowest bidders, contract provisions have been upheld which require the contractor to restrict the hours of labor to a reasonable maximum,[50] such as eight hours,[51] and to pay a prescribed minimum wage.[52] Such provisions have been held not violative of a prohibition against special legislation, the insertion thereof in the contract being an administrative act,[53] and statutes and charters *295 sometimes require improvement contracts so to provide.”
Let us examine some of the leading cases cited which are decisive of the question at issue. In Hillig v. City of St. Louis, 337 Mo. 291, 85 S.W.2d 91, 92, appellants had brought a suit seeking an injunction to restrain the City of St. Louis from proceeding to award and perform a contract between it and a construction company from paving a public alley in St. Louis and to restrain the levying of the special tax against appellant’s property on account of the proposed improvement. A general demurrer was filed and sustained on the ground that the petition failed to state facts sufficient to constitute a cause of action against the respondents and final judgment was entered dismissing the petition from wnich the appellants appealed to the Supreme Court of Missouri.
The main question was the charge in the petition that prior to awarding the contract for the proposed improvement the city had passed a purported ordinance which, among other things, prescribed minimum rates and wages to be paid by contractors doing work under contract with the city; that all bidders for the work involved in the proposed improvement in question were notified, prior to submitting their bids, that they would be required to comply with the provisions of such ordinance and that the ordinance would in turn be made a part of any contract which might be awarded to the successful bidder for the work; that the construction company who was the lowest bidder for the work and the city had signed, or was about to sign, contract with that company for the work and that such contract by its terms would require the company to comply with the provisions of the ordinance.
In reaching a decision the Supreme Court of Missouri stated:
“(1) The Constitution of Missouri has conferred authority upon the qualified voters of the city of St. Louis to frame and adopt a charter. The existing charter of the city of St. Louis was adopted in 1914, and by virtue of its adoption it became and remains the organic law of the city. In general the charter of a city bears the same relation to its ordinances that the Constitution of a state bears to its statutes. Quinette v. St. Louis, 76 Mo. 402. With some exceptions not pertinent here, the charter of the city of St. Louis requires that ‘all public work’ shall be let ‘by contract to the lowest responsible bidder.’ Charter of the city of St. Louis, art. 22 § 4. The challenged Ordinance No. 40179 was duly enacted by the board of aldermen of the city of St. Louis and was approved by the mayor on November 9, 1933. This ordinance in substance provided, among other things, that in the case of contracts awarded by the city or its board of public service for the prosecution of public work on behalf of the city, such contract shall provide that all employees of the contractor while engaged in the performance of the work shall be paid hourly wages at a stipulated rate. The ordinance specified the hourly wage to be paid in various crafts and trades, e. g. asbestos workers $1.25 per hour, concreter employed as foreman 90 cents per hour, blacksmiths $1 per hour, etc. Section 3 of the ordinance provided: ‘If there be any craft or trade not included in the crafts or trades specified in Section 2 hereof, from which workmen or laborers are required to be used in the completion of any contract mentioned in Section 1 of this ordinance, for which such craft or trade there be in effect in the City of St. Louis at the time of advertising for bids for such work, wage rates established by agreement for such craft or trade between contractors and workmen for private work similar to the public work to be done by such craft or trade, such wage rates so established by contract or agreement are *296 hereby declared to be the wages required to be paid by Section 1(b) of this ordinance for such crafts or trades not specifically included in Section 2 hereof.’
“(2-6) In this state it is well settled that charter provisions requiring that contracts for public work be awarded, upon a public letting, to the lowest responsible bidder, are intended to secure free and unrestricted competition among bidders, to eliminate fraud and favoritism, and to avoid undue or excessive cost which would otherwise be imposed upon the taxpayer or property owner. Curtice v. Schmidt, 202 Mo. 703, 101 S.W. 61, 10 Ann.Cas. 702; Shoenberg v. Field, 95 Mo.App. 241, 68 S.W. 945; St. Louis Quarry & Construction Co. v. Von Versen, 81 Mo. App. 519; St. Louis Quarry & Construction Co. v. Frost, 90 Mo.App. 677; Muff v. Cameron, 134 Mo.App. 607, 609, 114 S.W. 1125, 117 S.W. 116; Glennon v. Gates, 136 Mo.App. 421, 118 S.W. 98; Taylor v. Schroeder, 130 Mo. App. 483, 110 S.W. 26; Allen v. Lab-sap, 188 Mo. 692, 87 S.W. 926, 3 Ann. Cas. 306. As a corrollary to the elementary principle just stated, our courts hold in general that where, in the letting of contracts for public work, restrictions or conditions are imposed upon bidders which tend to increase the cost of the work, such Conditions and restrictions are violative of charter provisions requiring that the contract for the work be let to the lowest responsible bidder. St. Louis Quarry & Construction Co. v. Frost, 90 Mo.App. 677; Allen v. Labsap, 188 Mo. 692, 87 S.W. 926, 3 Ann.Cas. 306; St. Louis Quarry & Construction Co. v. Von Versen, 81 Mo.App. 519. Applying the foregoing principles to the case before us, we are clearly of the opinion that Ordinance No. 40179 is void because it is in contravention of the provisions of the St. Louis charter requiring that 'all public work’ be awarded by contract to the ‘lowest responsible bidder.’ The ox'dinance, if effective, permits bidding only by those contractors who agree to pay the prescribed minimum wages. Other contractors who might, if permitted, do the work for a lower price, are prohibited from bidding or performing the work by the terms of the ordinance. Thus we have a situation where a contractor who can do the work equally as well, although cheaper, is excluded from bidding, while the ordinance clearly contemplates that the successful bidder will do the work at a cost which will at least equal the minimum amount specified for wages by the ordinance in question. Furthermore, since the ordinance in question requires all bidders for public work to pay a stipulated minimum wage to their employees, it is clear that the ordinance imposes a limitation other than responsibility upon all bidders, and hence the free competition prescribed by the charter is excluded and stifled. The respondent seeks to sustain the ordinance here in question by invoking the well-established principle that the specifications for work to be done under public competition in the execution of public improvements under city charters may in proper cases require the use of articles, apparatus, or commodities held in monopoly if they are shown to be superior, although to do so may result in excluding competition and increasing costs. Swift v. St. Louis, 180 Mo. 80, 79 S.W. 172; Barber Asphalt Paving Co. v. Hunt, 100 Mo. 22, 13 S.W. 98, 8 L.R.A. 110, 18 Am.St.Rep. 530; Wegmann Realty Co. v. St. Louis, 329 Mo. 972, 47 S.W. (2d) 770. But we think the principle just stated cannot properly be applied in the present case. In the execution of public projects some public authority is generally authorized to prepare specifications designating in detail the work to be done. The desired results could not be achieved — nor could any prog *297 ress be made — if the public authority authorized to act was not accorded a proper and reasonable discretion to require the use of articles, apparatus, or materials of superior quality, although held in monopoly. But it is clear that the exercise of the discretion to specify the use of articles held in monopoly in the execution of public work under city charters must be rather narrowly circumscribed. The public authority acting in the matter must exercise the utmost good faith, the article required to be used must be of superior quality, and its use must be shown to have a tendency to improve the intrinsic quality and character of the work to be done. In our opinion the principles just stated lend no support to the minimum wage ordinance here in question. There is no essential or necessary connection between the hourly wages paid by a contractor and the intrinsic quality and character of the work done. Furthermore, the ordinance requires the payment of the prescribed hourly wages to all employees irrespective of their experience, skill, or efficiency.
“(7) Respondents further contend that the ordinance here under consideration can be sustained as a proper exercise of the general police powers vested in the city by the provisions of its charter. The provision of the charter requiring ‘all public work’ to be let by contract ‘to the lowest responsible bidder’ is a specific requirement prescribing the course to be followed in awarding contracts for public work. The charter provision last mentioned itself relates to the exercise of police powers by the city and prescribes how the powers vested shall be exercised. We are of the opinion that the general police pozvers vested in the city by its charter cannot properly be so interpreted and applied as to modify or relax the specific requirements of the charter as to the letting of contracts for public zvork. Emphasis added.
“(8) For the reasons heretofore staf--ed, we are constrained to conclude that Ordinance No. 40179 is void because of the minimum wage provisions contained therein.”
Philson v. City of Omaha, Nebraska et al., 167 Neb. 360, 93 N.W.2d 13, 15, was a suit for a declaratory judgment asking that an ordinance be declared null, void and unenforceable insofar as it contained a requirement for a minimum wage as being contrary to the “home rule charter of the city required all bids to be let to the lowest responsible bidder. It is the contention of the plaintiff that the ordinance fixing the minimum wage scale which bidders would be required to observe contravenes the chárter provision that bids shall be let to the lowest responsible bidder.” The court stated that the question presented is “one of first impression in this state. We think the reasoning contained in Hillig v. City of St. Louis, 337 Mo. 291, 85 S.W.2d 91, 92, controls the disposition of the case at bar.” The court then quoted with approval and followed the reasoning and conclusion of the Supreme Court of Missouri in the Hillig case when it concluded “that the ordinances in question are inimical to the provisions of the home rule charter that public contracts shall be let to the lowest responsible bidder. They are therefore void and unenforceable.”
In Arkansas-Missouri Power Corporation v. City of Kennett, 348 Mo. 1108, 156 S.W. 2d 913, 918, the Supreme Court of Missouri in dealing with a contention by the plaintiffs that contracts between the city and the construction company were void because they contained minimum wage and maximum hour requirements after holding that the city of Kennett as a “third class” city was not subject to any statutory restrictions as to such a provision stated:
“ (8,9) Plaintiffs contend, however, that the present case is ruled by our decision in Hillig v. City of St. Louis, 337 Mo. 291, 85 S.W.2d 91, 92. That case, however, is clearly distinguishable *298 from the one at bar. Our decision therein was based solely on the provisions of Sect. 4 of Act. 22 of the Charter of St. Louis which required that all public works contracts be let 'to the lowest responsible bidder.’ We held that the inclusion of minimum wage scales in the specifications on which proposals were to be submitted introduced an element other than that of responsibility and thereby illegally restricted the bidding. St. Louis Quarry & Construction Co. v. Frost, 90 Mo. App. 677; Allen v. Labsap, 188 Mo. 692, 87 S.W. 926, 3 Ann.Cas. 306; St. Louis Quarry & Construction Co. v. Von Versen, 81 Mo.App. 519. Cases from other jurisdiction [sic] have adopted a similar view where a statute or charter unequivocally required the letting of public contracts to the lowest bidder. Bohn v. Salt Lake City, 79 Utah 121, 8 P.2d 591, 81 A.L.R. 215; Wilson v. City of Atlanta, 164 Ga. 560, 139 S.E. 148. But, in the absence of a statute or charter provision so requiring a letting to the lovoest bidder, a different result is reached in some of the better-reasoned cases. Memphis Power & Light Co. v. City of Memphis, 172 Tenn. 346, 112 S.W.2d 817. Plaintiffs have not cited us to any statutory provision applicable to cities of the third class requiring the letting to the lowest bidder.” Emphasis added.
We are of the opinion that the better rule, as well as the weight of authority, is to the effect that a provision is a contract for public works, as in the case at bar, requiring the successful bidder-contractor to pay not less than a specified minimum wage, is violative of the charter provisions of the City of Baton Rouge and the Parish of East Baton Rouge, and Title I, Section 701 of the Baton Rouge City Code, which is expressly applicable to the Parish of East Baton Rouge and the City of Baton Rouge, both of which require that the contracts for the work be by competitive bidding and let to the lowest responsible bidder.[3]
Counsel for plaintiff-appellee and for the intervenors herein contend that the contract provision (8:12) requiring and establishing a minimum wage rate to be paid by the contractor is not prohibited by LSA-R.S. 38:2211, the provisions of the charter or of the code governing the City of Baton Rouge and the Parish of East Baton Rouge, supra, which require competitive bidding and a letting to the lowest responsible bidder, and in the main rely upon Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627; Spahn v. Stewart, 268 Ky. 97, 103 S.W.2d 651, 659, and Malette v. City of Spokane, 77 Wash. 205, 137 P. 496, 498, 51 L.R.A.,N.S., 686, and Iowa Electric Co. v. Town of Cascade, supra. We have heretofore in a foot note discussed the Cascade case which is in line with the exception to the general rule that a provision or requirement for a minimum wage rate is not a violation of “the lowest responsible bidder” law, in contracts for public works involving a Federal grant. We express no opinion on *299 the Cascade case as we are not concerned with a Federal grant.
In aid of their contentions counsel cite and quote from the Boxwell case the following :
“ * * * It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving exorbitant and extortionate prices * * [203 La. 760, 14 So. 2d 631].
We do not believe that this case in any particular supports the plaintiff and/or intervenors contention. In this case the Louisiana Metal Culvert Company, a partnership composed of James Thomas and Leslie G. Boxwell, sold and delivered in a number of separate transactions, certain materials to the Louisiana Highway Commission which disclosed prices charged in excess of $500. The Louisiana Metal Culvert Company was dissolved and its claim against-the Department of Highways was transferred and assigned to Leslie G. Box-well and Charles Vernon Baker who brought suit against the Department asking a judgment for $28,665.82.
As a special defense defendant plead that the sales, except those prices less than $500, were illegal, null and void because of their having been made without advertisement and competitive bidding as required by Act No. 73 of 1926 as amended by Act. No. 20 of 1935, 4th Extra Session, which is materially the same as LSA-R.S. 38:2211. The Court in part stated:
“This statute in so far as it requires advertising and the obtaining of competitive bids is a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving exorbitant and extortionate prices. It was not passed for the benefit of the officials and the entities which they represent.
“A contract made in violation of that statutory requirement is wholly illegal. According to the great weight of authority, it is unenforceable even though the work has been performed or materials furnished; neither can recovery' be had on a quantum meruit basis. In this connection, it is said in 43 American Jurisprudence (verbo Public Works and Contracts), § 95, that:
“ ‘It is well established that no recovery can be had by a contractor for the construction of a public improvement or other contract with a public body made by public authorities without compliance with the provisions of law requiring letting of such contracts upon competitive bidding, even though such contract is duly executed and signed and the work has been executed in accordance with its terms. Not only is the contract itself illegal and unenforceable, but the general rule is that there is no implied liability on the part of the municipality or other public body with which such contract was attempted to be made for work to be done or materials furnished pursuant thereto, for the reasonable value of the services or materials, even though the public body has received the benefits of such performance. These provisions exist to protect citizen taxpayers from unjust, ill-considered or extortionate contracts, or those showing favoritism, and if the public body is suffered to disregard them and the other party permitted to recover upon an implied contract, such, provisions can always be evaded and set at naught. To depart from these principles would be to open the door to abuses and practices fraught with danger to the welfare of the citizens and taxpayers of municipalities and political subdivisions of the state.’
íjs H* s|c
*300 “A different kind of nullity, however, exists here. A statutory provision founded on public policy and enacted for the protection of the taxpayers has been violated, producing a nullity absolute in character, void ab initio.
“Persons cannot by their contracts 'derogate from the force of laws made for the preservation of public order or good morals.’ Revised Civil Code, Article 11 * *
In Spahn v. Stewart, supra, relied upon by plaintiff and intervenors, it was held:
“It is contended that the resolution and ordinance are invalid because in such contract as the Housing Commission may make, certain prescribed wages for labor are to be paid and the laborers to be limited to so many working hours. This provision in the resolution is there placed because it is a condition upon which the grant of financial aid is proffered by the government. It is said the resolution is contrary to public policy and violates such parts of the act of 1934 (section 4, c. 113) as require that all contracts be let upon competitive bidding to the best bidder. Two principal features of the act must be considered: One, that the act has as one of its outstanding purposes the procurement of financial aid from the government; second, that the work contemplated is of a public nature, as we think we have sufficiently pointed out. The work done in the consummation of the plan is essentially public work. A distinction as between liberty in contracting where private enterprise or public work is concerned, was recognized by the Supreme Court in Morehead v. People of New York ex rel. Tipaldo, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (cited).
“Our General Assembly, ready to accept the benefit of the national laws offering grants in aid of public enterprises, began in 1934 to take advantage of such offers. In that year the Assembly enacted Chapters 68, 69, 72 and 113, and at an Extraordinary Session in the same year, chapters 14 and 15 were enacted, each and all adopted for the purpose of aiding municipalities in obtaining federal aid in the erection of public buildings; these may be, as some of them were termed, ‘Financial Distress Acts’. The last two chapters, supra, extended to counties the authority to obtain relief in the erection of adequate public school quarters. By these acts the Assembly has determined and announced a definite policy in relation to conditions upon which aid may be accepted and applied in the erection of public buildings. The general plan provided in chapters 68 and 69 was approved in * * * (cases cited).
“It is well settled that when the Legislature delegates a power to a municipal corporation that body has the implied right to select the means by which the purpose may be accomplished, provided always that the adopted means do not transcend any constitutional inhibition. (cases cited).
“There is no avoidance of competitive bidding here. We have defined ‘competitive bidding’ to be such as ‘requires that all bidders be placed on a plane of equality, and that they bid upon the same terms and conditions.’ (cases cited) ‘Competitive bidding means that the council must by due advertisement give opportunity for every one to bid.’ (cases cited). In City of Springfield v. Haydon, [216 Ky. 483, 288 S.W. 337], we upheld a contract let on bid, in which the proposal called for a material possible of being furnished by only one concern in the entire country, saying that there is competitive bidding ‘unless the advantage, by its terms excludes other bidders.’ (cases cited) In the case of Denton v. Carey-Reed Co., 169 Ky. 54, 183 S.W. 262, 263, where only one bid was re *301 ceived for street reconstruction, we held that the contract was valid since there was a reasonable bid, ‘fairly made at a public letting, legally advertised and open to all.’ Appellants or any party feeling aggrieved at any action taken by the commission in attempting to let proposed contracts, may in a proper proceeding raise any question of unfairness or illegal procedure.” [268 Ky. 97, 103 S.W.2d 659],
This case is to be considered as coming under the exception to the general rule, for it is clear from the above quote that the objection to the resolution as being contrary to public policy and violating “such parts of-the act of 1934 (Section 4 c. 113) as require that all contracts be let upon competitive bidding to the best bidder” was contained in the very act which the court said had as one of its outstanding purposes the procurement of financial aid from the Government. The court went on further to say that the General Assembly, in order to accept the benefits of the national laws offered grants in aid of public enterprises, began in 1934 to take advantage of such offers by enacting the Acts of 1934 and amendments thereto, which were all adopted for the purpose of aiding municipalities in obtaining Federal aid in the erection of public buildings, and the court specifically held that by these acts the assembly had determined and announced a definite policy in relation to conditions upon which aid could be accepted and applied in the erection of public buildings. It must be remembered that the Federal government, before giving a grant in aid, requires a minimum wage stipulation, and, therefore, if the General Assembly passed the 1934 Act for that very purpose and put in the requirement that contracts be let upon competitive bidding to the best bidder, this clause was never intended to defeat the very purpose of the act.
Malette v. City of Spokane, supra, concerns an objection by an adjoining property owner to the adherence to a minimum wage requirement by the successful bidder that had been inserted in [jis contract to pave the streets adjoining the plaintiff’s property. The Legislature of the State of Washington passed an act requiring an eight hour work day for state, county and municipal employees. The City of Spokane followed this enactment with municipal ordinances to the same effect and, in addition, provided minimum wages for all work done for the city by employees, contractors, etc. The Court held that where public improvement contracts are required by law to go to the lowest bidder, restrictions like the above would be invalid, however, neither in the State of Washington nor the City of Spokane is there any competitive bidding law. The requirements were held valid as being reasonable.
The case of Stover v. Winston Bros. Company, 185 Wash. 416, 55 P.2d 821, 823, is not apposite for the same reason, as the Malette case, viz., that neither the State of Washington nor Seattle had a statute or ordinance requiring competitive bidding and letting to the lowest responsible bidder. Therefore, there was no question before the court as must be decided in the case at bar.
We are in entire accord with the argument and statement of plaintiff and intervenors that: “It has been settled for many years that the passage of minimum wage legislation is a matter within the police power of State and Federal Governments. See Annotation, 50 A.L.R. 1480.” We would also add that minimum wage legislation is a matter within the police power of a municipality, where general police power has been delegated to it by the State as in the case at bar. However we must not lose sight of the fact that the “lowest responsible bidder” enactment in the charter of the city and parish and contained in the City Code of Baton Rouge, is likewise a valid exercise within the general police power of the city and parish under delegation of such general police power by the *302 State of Louisiana. We have the same contention being made in the case at bar as was made in Hillig v. City of St. Louis, supra, viz.: “that the ordinance here under consideration can be sustained as a proper exercise of the general police powers vested in the city by the provisions of its charter.” [337 Mo. 291, 85 S.W.2d 93], The only difference at this point in the cases is that we'are dealing with a provision (8:12) in a contract for public work requiring the payment of a minimum wage. We are in accord with the holding in the cited case as governing our decision on the same contention being made in the case at bar, and we quote:
“ * * *. The provision of the charter requiring ‘all public work’ to be let by contract ‘to the lowest responsible bidder’ is a specific requirement prescribing the course to be followed in awarding contracts for public works. The charter provision last mentioned itself relates to the exercise of police powers by the city and prescribes how the powers vested shall be exercised. We are of the opinion that the general police powers vested in the city by its charter cannot properly be so interpreted and applied as to modify or relax the specific requirements of the charter as to the letting of contracts for public work.”
The defendant lastly contends that the contract provisions are also violative of the public policy of the state as expressed in LSA-R.S. 23 :822, and Chapter 8, Title 23, Section 822, which establishes the public policy of this State with reference to management and labor. No authority is cited for this contention. We are not impressed with this contention, and as this is an action for declaratory judgment on the issues presented we hereby hold that if LSA-R.S. 38:2211, the Charter and Code of the City and Parish, are amended in accordance with law so as to except or exclude from the effect of its provisions with regard to the advertisement and letting of contracts to the lowest responsible bidder, the contract provision in question would be legal and within the valid exercise of the general police powers vested in the city and parish, and would not be violative of the provisions, supra.
For the above and foregoing reasons, we therefore hold that the City of Baton Rouge and the Parish of East Baton Rouge, the latter being the plaintiff herein, are vested with the inherent power under and by virtue of the delegation of general police power from the State of Louisiana as expressed in the original charter of the City of Baton Rouge enacted in 1898, the present plan of government of the Parish of East Baton Rouge and the City of Baton Rouge, and amendments thereto, and Act 150 of 1958 in which the State delegates general police powers to the Parish of East Baton Rouge, in addition to the powers granted under the plan of Government to enact and enforce laws and regulations to protect the public health and safety and promote the general welfare of the people, under which would be included an enactment or regulation as provided by contract provision 8:12, unless such enactment or regulation is violative, and therefore barred, by the provisions of its charter.
We further hold that contract provision 8:12 is violative of a charter provision, as well as a codal provision, of the City of Baton Rouge and the Parish of East Baton Rouge, and therefore invalid.
For the above and foregoing reasons the judgment of the lower court is reversed and the plaintiff is hereby ordered to pay all legal costs in accordance with law.
Reversed.
HERGET, J., recused.

. This Distict is situated partly in the City of Baton Rouge and the Parish of East Baton Rouge, Louisiana.

. City Charter of the City of Baton Rouge, Louisiana.

“54. Mo. — Hillig v. City of St. Louis, 85 S.W.2d 91, 337 Mo. 291.
“Tex. — Montgomery v. City of Alamo Heights, Civ.App., 8 S.W.2d 258, error dismissed. * * *

“64. Mo.- — Hillig v. City of St. Louis, 85 S.W.2d 91, 337 Mo. 291. 44 C.J. p 331 note 41.
“Contract provisions fixing maximum liours and minimum wages generally see infra § 1162.

“Police Poioer

“Ordinance fixing minimum wage is not justifiable under police power. Hillig v. City of St. Louis, supra.

“65. Mo. — Arkansas-Missouri Power Corporation v. City of Kennett, 156 S.W.2d 913, 348 Mo. 1108.

“66. Mo. — Arkansas-Missouri Power Corporation v. City of Kennett, supra.

“Federal aid

“Where city will receive by grant from national government a sum greatly in excess of the amount by which bids could possibly be increased by inserting minimum wage and maximum hour provisions in contract, contract containing such provisions is not void on ground that bidding is illegally restricted. — Arkansas-Missouri Power Corporation v. City of Kennett, supra.

“31. Wash. — James v. Seattle, 95 P. 273, 49 Wash. 347. 44 C.J. p 348 note 90.

“32. Ala. — Inge v. Mobile Public Works, 33 So. 678, 135 Ala. 187, 93 Am.S.R. 20. 44 C.J. p 348 note 91. * * *

“50. Mo. — Arkansas-Missouri Power Corporation v. City of Kennett, 156 SW.2d 913, 348 Mo. 1108.

“51. Ill. — DeWolf v. People, 66 N.E. 868, 202 Ill. 73. 44 C.J. p 348 note 8.

“52. Mo. — Arkansas-Missouri Power Corporation v. City of Kennett, 156 S.W.2d 913, 348 Mo. 1108.
“Ohio. — -Dougherty v. Polk, 46 N.E.2d 307, 70 Ohio App. 304 — -Priest v. City of Wapakoneta, App., 32 N.E.2d 869, appeal dismissed 9 N.E.2d 292, 132 Ohio St. 527.
“Wash. — Stover v. Winston Bros. Co., 55 P.2d 821, 185 Wash. 416, appeal dismissed Winston Bros. Co. v. Stover, 57 S.Ct. 44, 299 U.S. 508, 81 L.Ed. 376. 44 C.J. p 348 note 9.

“Work outside municipality

“City was held to have right to insert in contract for construction of dam outside city limits provision fixing wage scale. — Stover v. Winston Bros. Co., 55 P.2d 821, 185 Wash. 416, appeal dismissed Winston Bros. Co. v. Stover, 57 S.Ct. 44, 299 U.S. 508, 81 L.Ed. 376.

“53. Mo.- — Arkansas-Missouri Power Corporation v. City of Kennett, 156 S.W.2d 913, 348 Mo. 1108.

. An exception to the rule has been established by jurisprudence in cases where such a requirement would enable the governing authorities to obtain a Federal grant in aid of the improvement. Iowa Electric Company v. Town of Cascade et al., 227 Iowa 480, 288 N.W. 633, 636, 129 A.L.R.. 758. The rationale used by the court in upholding the validity of a provision establishing minimum rates of wages to be paid employees engaged upon the project in accordance with rates prevailing of a similar nature in the locality in which the project was to be constructed in tbe face of the contention that the adoption by the Town Council of the minimum wage scale constituted such an interference with free and open competitive bidding upon the project as to render the proceedings void was contained in the following language of the court: “ * * * since the grant was over twice the amount of the total labor cost on the project the provision in the specifications for the payment of a minimum wage scale could not possibly be considered as having increased the cost to the users of electricity.”